SAUL DUFF KRONOVET, General Partner, t/a Twin
Towers Associates et al. *v.* MARC
J. LIPCHIN et al.

[No. 137, September Term, 1979.]

*Decided June 17, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON AND RODOWSKY, JJ.

*Alfred L. Scanlan,* with whom were *William W. Cahill, Jr., Christopher C. Sanger, Henry S. Ruth, Jr., William N. Eskridge, Jr.,* and *Shea & Gardner* on the brief, for appellants.

*Allan J. Malester,* with whom were *Lawrence D. Coppel, Gloria M. Belgrad* and *Gordon, Feinblatt, Rothman, Hoffberger & Hollander* on the brief, for appellees.

RODOWSKY, J., delivered the opinion of the Court.

This appeal presents questions between developers-mortgagors and the permanent lender arising out of two actions by the lender to enforce remedies on default. The instant actions are but part of the panoply of litigation brought in the wake of the collapse of a multi-million dollar real estate venture. After trial the Circuit Court for Prince George's County found for the lender. Certiorari was issued prior to consideration of the developers' appeal by the intermediate appellate court.

In affirming the decree below, we shall hold in response to the contentions raised that:

1. The transaction is not usurious under Maryland law, which the parties chose by contract as controlling the interest aspects of their transaction;
2. There was no error in the admission of certain expert testimony;
3. The principal debt carries interest at the contract rate after default and without reduction to 6% following the decree here appealed; and

4. The modified stay of proceedings entered by a federal bankruptcy court, which permitted determination of the issues below, but not enforcement of that determination, does not deprive the issues of "justiciability."

The real estate project, "Presidential Towers," is a 509 unit highrise apartment house, consisting of two 20-story towers connected at ground level by a one-story common lobby. Presidential Towers is located at the intersection of Metzerott Road and New Hampshire Avenue in Prince George's County, Maryland. Appellants are the owners, in the form of limited partnerships, of the leasehold and reversionary interests, and their managing agent. Appellees are the permanent lender, Jamaica Savings Bank ("Jamaica"), a New York mutual savings bank, and its substituted trustees under consolidated deeds of trust securing notes purchased by Jamaica on August 25, 1971 in the roll over to permanent financing.

On December 22, 1976 Jamaica, alleging default and relying on provisions in the deeds of trust, brought an action on the equity side of the court below to obtain possession of the project and control of the rent collections (the "Possession Action").[1] On December 28, 1976 Jamaica followed up by docketing foreclosure proceedings (the "Foreclosure Action"). These actions were consolidated. The defendants asserted usury and that Jamaica had agreed to forbear exercising its remedies for default. A bifurcated trial of the forbearance issue resulted in dismissal of that defense on December 5, 1977. That determination is not questioned on this appeal.

The owners of the project then sought the protection afforded under the Federal Bankruptcy Act. On December 20, 1977 each filed petitions under Chapter XII in the United States District Court for the Southern District of New York,

---

1. The principal appellants, in late December 1976, sued Jamaica in the New York state courts for alleged tortious interference with their relationship with the managing agent. The record here does not reflect any rulings in that "Interference Action" after denial on January 5, 1977 of a request preliminarily to enjoin Jamaica from proceeding in Maryland.

resulting in stays of the Possession and Foreclosure Actions.[2] On March 10, 1978 the stay was modified "to permit the completion of the Possession Action."[3]

Our scene shifts back to Maryland for trial of the usury issue. The August 25, 1971 permanent financing by Jamaica carried interest at 8.375% per annum. Borrowers asserted that New York law applied under which the interest ceiling was 7.5%.[4] Jamaica argued that Maryland law applied and, because the loan was for the purpose of carrying on a commercial enterprise or investment, there was no statutory limit.[5]

The parties start from a common premise, *i.e.,* that the law applicable to interest and usury has been contractually chosen in the consolidation and extension agreement (the "C&E") of August 25, 1971. It provides in immediately successive paragraphs as follows:

> The parties hereto agree that this Agreement has been negotiated in the State of New York and that this agreement shall be enforced under, and in accordance with the laws of the State of New York, and all the parties for all purposes hereunder do hereby agree and do hereby submit to the

---

**2.** The debtors also obtained bankruptcy court authorization to institute, and did institute, a state court action in New York against Jamaica alleging· that the permanent loan was usurious under New York law (the "New York Usury Action"). Cross motions for summary judgment in the New York Usury Action were denied on the ground that a trial was necessary "to consider the surrounding circumstances existing when the contract was entered into, the situation of the parties and the subject matter of the instrument." Presidential Towers Land Associates and Twin Towers Associates v. Jamaica Savings Bank, No. 07731/77 (Sup. Ct. Special Term, New York Co., Part I, filed Oct. 25, 1977) (Ascione, J.).

**3.** The bankruptcy court made written findings of fact and conclusions of law in support of this order which recognized the pendency of the Foreclosure Action as well as of the Possession Action. The parties have treated the subsequent proceedings in the Circuit Court for Prince George's County as proceedings in consolidated Possession and Foreclosure Actions and we shall do the same.

**4.** N.Y. Gen. Oblig. Law, § 5-501 (McKinney 1978) and 3 New York Code of Rules & Regulations (1979), § 4.1.

**5.** Md. Code (1957, 1968 Repl. Vol., 1971 Cum. Supp.), Art. 49, § 7, as enacted by Maryland Laws (1968), Ch. 453, § 7. The provision is now Md. Code (1975, 1979 Cum. Supp.), §§ 12-101 and 12-103 (e) of the Commercial Law Article.

jurisdiction of the Courts of the State of New York. [The "New York Clause"].

The Note secured hereby is transacted solely for the purpose of carrying on or acquiring a business or commercial investment within the meaning of Section 7 of Article 49 of the Maryland Code, Annotated, and this instrument is not a purchase money deed of trust. [The "Maryland Clause"].

The court below on May 7, 1979 held that the transaction was not usurious; made findings as to the amount of indebtedness, with interest, due to Jamaica as of January 1, 1979; granted "a permanent order of possession with respect to the mortgaged property"; and decreed that the plaintiffs may prosecute and complete the Foreclosure Action.

The decree further provided that

the portion[s] of this Decree granting the Permanent Order of Possession and permitting the prosecution and completion of the Foreclosure Action, are subject only to further lawful directives and orders of the Bankruptcy Court and the granting of such relief herein is not intended to be in contravention of any order of the Bankruptcy Court. . . .

A somewhat detailed statement of the facts is required to set forth the reasons which support the trial court's conclusions.

### History Of The Transaction

The project was originally a venture of Realty Equities Corporation of New York ("Realty Equities") which in 1968 held the subject, then unimproved, property through its subsidiary, R.E. Americana Land Corporation, a Maryland corporation ("Land Corp."). A $400,000 land loan had been made to Land Corp. on December 11, 1968 by Benjamin C. Cohen of New York. The note, made and payable in New York, provided that New York law should govern. It was

payable in one year and carried 18% per annum interest.[6] This note was secured by a deed of trust to Edward W. Nylen, Esq. and John D. Gilmore, Jr., Esq. of Maryland. We shall refer to this $400,000 secured indebtedness as "Loan A".

In 1969 a representative of Realty Equities approached one of the appellants, Saul D. Kronovet ("Kronovet"), concerning investment in the project. Kronovet is a member of the New York Bar. Negotiations resulted in participation by a group of investors led by Kronovet (the "Kronovet Group").[7] A Maryland limited partnership, Twin Towers Associates ("Twin Towers"), was formed. A ground lease was created from Land Corp. to Twin Towers on December 16, 1969. Loan A was subordinated to the ground lease.

The Kronovet Group comprised the limited partners of Twin Towers and made an initial capital contribution, in installments, of $1,500,000. The general partner of Twin Towers was R.E.C. Americana Corporation ("Americana"), a Maryland corporation and a subsidiary of Realty Equities. Under its Articles of Limited Partnership the sole purpose of Twin Towers was to construct, manage and otherwise deal in the project, and its initial principal place of business was in Maryland.

Construction financing by American Security and Trust Company ("AS&T"), a District of Columbia trust company, had been arranged by Realty Equities. Initial closing of the $6,500,000 construction loan was on December 29, 1969. The note was made by Twin Towers and is dated in Maryland. This loan ("Loan B") carried interest at 8.75% per annum and was due December 31, 1971 or earlier, upon assignment to the then contemplated interim take out lender, I.F.C. Collateral Corporation. The note for Loan B provided it "shall be governed by and construed according to the laws of the State of Maryland," and also contained the following paragraph:

---

**6.** N.Y. Gen. Oblig. Law, § 5-521 (McKinney 1978) prohibits corporations from interposing the defense of usury.

**7.** The record indicates that Kronovet is involved in about 60 other properties, representing in most cases the limited partners.

██

Borrower stipulates and warrants that the purpose of the loan evidenced hereby is for the purpose of a business or commercial investment within the meaning of Section 7 Chapter 453 of the Laws of Maryland 1968. Borrower further stipulates and warrants that all proceeds of said loan will be used for said business or commercial investment purpose.

The note was secured by a deed of trust made by Twin Towers in which Land Corp. joined for the purpose of extending the lien to its fee simple estate. Paragraph 25 of this deed of trust provided:

That the property herein mortgaged being located in the State of Maryland, this Deed of Trust and the rights and indebtedness hereby secured shall, without regard to the place of contract or payment, be construed and enforced according to the laws of the State of Maryland.

It appears from Kronovet's testimony that construction commenced utilizing equity capital, and that advances under the construction loan could not be obtained because of the outstanding lien of Loan A which Realty Equities had not paid. On August 13, 1970 Kronovet arranged for the holder of the Loan A note to be paid and the note was assigned to Kronovet. At that time the lien securing Loan A was subordinated to the construction loan. As part of the overall transaction a contract was made between the Realty Equities' interests and the Kronovet Group under which the latter could acquire at least part of the Realty Equities' position in the project.

In late December 1970 Twin Towers refinanced Loan A with, and borrowed an additional $100,000 from, the trustees of Guardian Mortgage Investors ("Guardian"), a Massachusetts business trust with its principal office in Jacksonville, Florida. A new note from Twin Towers and a new deed of trust by Twin Towers and Land Corp. were created for the $100,000 additional advance, due December 31, 1971 ("Loan C"). The deed of trust note from Loan A, by

assignment from Kronovet to Guardian, was used to evidence and secure the $400,000 refinancing. A novation was effected under which Land Corp. was released as maker of the note on Loan A and Twin Towers assumed the note obligation. That note was modified to provide for interest at 14% and extended to December 31, 1971. Twin Towers conveyed of record its leasehold interest to Nylen and Gilmore, as trustees of the deed of trust securing Loan A. The note and deed of trust from Loan A were further modified to conform to the terms of the note and deed of trust utilized for Loan C. As a result, the notes for Loan A, as modified, and for Loan C contain the following provision: [8]

> The laws of the state where the property is located shall govern the construction and enforcement of this Note and the deed of trust which secures the same.

The deeds of trust for Loan A, as modified, and for Loan C then each provided that

> [t]he Note hereby secured is transacted solely for the purpose of carrying on or acquiring a business or commercial investment within the meaning of Section [7] of Article 49 of the Annotated Code of Maryland and this instrument is not a purchase money deed of trust.

Thus, at the end of 1970, the project was subject to $7,000,000 of principal amount of mortgage debt represented by the first lien of the construction loan from AS&T of $6,500,000 (Loan B), the $400,000 second lien of Loan A, now held by Guardian, and the $100,000 third lien of Loan C from Guardian.[9]

---

**8.** The $100,000 note also provided that it and the Loan A note would, in the event of purchase by I.F.C. Collateral Corporation, be further modified to express, *inter alia,* a warranty of business purpose within the meaning of Ch. 453 of the Laws of Md. of 1968.

**9.** There was also a fourth lien on the reversion only, created by a deed of trust from Land Corp. to Nylen and Gilmore securing a note of $400,000 dated December 30, 1970 from Land Corp. to Kronovet which represents the August 1970 payment on behalf of Realty Equities to Cohen by the Kronovet Group to obtain the note of Loan A from Cohen. The December 30, 1970 note carried 18% per annum interest and contained a New York choice of law clause.

The $7,000,000 of debt was due December 31, 1971. The members of the shaky alliance between Realty Equities and the Kronovet Group had breathing room to shop against the standby take out commitment from I.F.C. Collateral Corporation which, as part of the December 1970 debt restructuring, had been amended to increase the interest rate to the greater of 15½% or nine points over prime at certain New York banks.

At this point Jamaica enters.

On February 11, 1971 Twin Towers, acting through its general partner, Americana, accepted a commitment from Jamaica under which Jamaica would "purchase by assignment a permanent first leasehold mortgage loan, with the fee subordinate to [the] first mortgage lien" in the amount of $7,500,000 for a term of twenty-three years with interest at the annual rate of 8.375%. The commitment contained the following provision which was to survive closing:

> The parties agree that this commitment has been negotiated in the State of New York and that this commitment shall be enforced under, and in accordance with the laws of the State of New York, and all the parties for all purposes hereunder do hereby agree and do hereby submit to the jurisdiction of the Courts of the State of New York.

The commitment also provided that "[s]ince this loan is to be originated in Maryland by a Maryland interim lender it will be necessary for ... a Three Party Purchase and Sale Agreement" to be executed.

Armed with the Jamaica commitment, Twin Towers returned to AS&T to comply with the commitment and to realize on the additional $500,000 of borrowing capacity. On April 8, 1971 an agreement of purchase and sale was made between Twin Towers and Land Corp. as borrowers, AS&T and Jamaica. AS&T in essence agreed to lend an additional $500,000 and Jamaica agreed to purchase by assignment notes secured by deeds of trust up to a full amount of

principal advanced of $7,500,000, subject to conditions including the execution of a consolidation and extension agreement. While Guardian was not a signator, the agreement recognized the existence of $500,000 of debt on the property secured by mortgages held by one other than AS&T.

The roll over to the permanent loan was closed at Jamaica's offices in New York commencing August 25, 1971. Twin Towers borrowed from AS&T $500,000 evidenced by a deed of trust note dated August 24, 1971 and on its face made in Maryland. This note ("Loan D") contains the same Maryland choice of law provision and the same warranty of business purpose under Ch. 453 as did the note on Loan B. The Loan D note was secured by a deed of trust made by Land Corp. and Twin Towers which contains the same Maryland choice of law provision as did the deed of trust for Loan B. Guardian assigned without recourse to Jamaica the notes from Loans A and C and AS&T assigned without recourse to Jamaica the notes from Loans B and D. Jamaica paid for the notes by wire transfer of $7,000,000 directly to the account of AS&T and of $500,000 directly to the account of Guardian.

In connection with the August 25, 1971 closing, the C&E, containing the New York Clause and Maryland Clause, was executed by all parties [10] except Jamaica which delayed signing until July 1972.[11]

The principal purposes of the C&E were to modify the interest rates of the four notes to 8.375%, to extend the due dates to August 25, 1994, to consolidate the liens of the four deeds of trust so that they should constitute but one deed of trust, a single lien, securing the $7,500,000 with interest, and to make uniform the provisions of the deeds of trust. The latter was accomplished principally by the attachment as an exhibit of the printed form of mortgage provisions, with

---

**10.** Parties to the C&E were the trustees under the deeds of trust for Loans A, B, C and D, in addition to Twin Towers, Land Corp. and Jamaica.

**11.** Jamaica was concerned that, under the Maryland mechanics' lien law then in effect, mechanics' liens may have intervened, particularly with respect to Loans C and D. Jamaica did execute, at closing, a longhand agreement the effect of which was to extend the due dates of the notes of Loans A-D but not immediately to effect the consolidation.

modifications, utilized by Jamaica and by providing that the printed form would control in the event of conflict over the typewritten portions of the C&E.

In January of 1972 Kronovet became the sole general partner of Twin Towers. In April of 1972 the C&E was modified to permit Twin Towers to defer interest for a limited period. At the time of this modification the title to the reversion was held by Presidential Towers Land Associates, a New York limited partnership ("Presidential") through a nominee. Presidential had been formed to take title to the reversionary interest when Realty Equities was unable to perform under the agreement made with the Kronovet Group in connection with the refinancing of note A.[12] Presidential is composed of persons who are limited partners in Twin Towers. Its general partners are Kronovet and R.L.U. Realty Corporation, a New York corporation. The deed from the nominee to Presidential of the reversionary interest was recorded March 20, 1973.

After the Kronovet Group gained control of the project they borrowed on a second mortgage and there is evidence that they embarked on a program of rehabilitation. However, on April 5, 1975, Presidential Towers was struck by a wind storm of a velocity which appellants say had never previously been recorded in the Washington, D.C. metropolitan area.[13] A 200-square foot panel of bricks on the 19th and 20th floors of one of the towers fell onto and collapsed the connecting lobby. As a result, tenants vacated. Tenants failed to renew. Tenants could not be attracted or retained by rent reductions. Twin Towers' income shrank. The loan from Jamaica went into default. The Possessory Action and the Foreclosure Action were brought.

The foregoing convolutions have resulted in the party alignments of the instant litigation. In the Possession Action the defendants were Kronovet as sole general partner of

---

12. The difficulties between the Kronovet Group and Realty Equities also spawned a lawsuit by the Kronovet Group against the auditors under engagement with Realty Equities at the time of the initial investment by the limited partners in Twin Towers.

13. The claim against the property damage insurer also resulted in litigation.

Twin Towers and as a general partner of Presidential, R.L.U. Realty Corp. as a general partner of Presidential and Jerome Z. Lorber, the managing agent of the apartments. In the Foreclosure Action Twin Towers, Land Corp. and Land Corp.'s successor in title, Presidential, were defendants. The usury defense presented here relates to the C&E of August 1971 which was signed by Twin Towers as leasehold owner when its general partner was Americana, a subsidiary of Realty Equities, and also signed by Land Corp., a Realty Equities subsidiary, when it was the fee owner.

### The Usury Issue

Turning to the law applicable to the rate of interest called for by the C&E,[14] we agree with the approach of the parties that this question may, within certain limits, be resolved by contract. This Court has previously given recognition, in effect, to party autonomy in conflict of laws relating to contracts. In *Williams v. New York Life Insurance Co.,* 122 Md. 141, 89 A. 97 (1913) we applied internal New York law to determine the amount of cash payable to the owner under an option of a paid-up life insurance policy and said:

> Nor is this situation relieved by the fact that the contract was a Maryland one, for it was expressly stipulated in the application, that the contract contained in the application and policy "shall be construed according to the law of the state of New York," an agreement which it was perfectly competent for the parties to make. [*Id.* at 147, 89 A. at 99].

---

**14.** The only Maryland decision disclosed by our research which deals with conflict of laws as to usury in a mortgage loan transaction is New York Security and Trust Co. v. Davis, 96 Md. 81, 53 A. 669 (1902) involving a Maryland borrower and Maryland security, a New York lender and a 7% rate which was permitted in New York. There was no contractual choice of law. The notes were dated Howard County, Maryland. It was held that "in the absence of proof to the contrary, the presumption is that a note is payable at the place where it is dated." *Id.* at 86, 53 A. at 670. The contract was held to be a Maryland contract and usurious.

Eastwood v. Kennedy, 44 Md. 563 (1876) involved usury as a defense to a non-resident attachment. We there looked to the *lex loci contractus,* that of the District of Columbia, under which the defense was time barred. No contractual choice of law was presented.

Judge Prescott, writing for the Court in a case involving conflict of laws as to checks, observed that "[i]t seems generally to be conceded that the proper law governing a bill or note is the law which the parties to the instrument intended to govern." *John Hancock Mutual Life Insurance Company v. Fidelity-Baltimore National Bank & Trust Company,* 212 Md. 506, 511, 129 A.2d 815, 819 (1957). An employment contract in *Globe Slicing Machine Company v. Murphy,* 161 Md. 667, 158 A. 26 (1932) provided that its validity, construction, interpretation or performance should be governed by the laws of New York. The defendant employer argued that the plaintiff's case failed for lack of proof of New York law. In rejecting that argument we observed that the "express adoption of the foreign law by the parties has the same effect as adoption by rule of law" but that, absent proof of the foreign law, this Court would look to the law of the forum. *Id.* at 671-72, 158 A. at 28. However, we have refused to apply the contractual choice of law where it was contrary to the public policy of this state. *Mutual Life Insurance Co. v. Mullan,* 107 Md. 457, 69 A. 385 (1908) (Maryland statute making statements in an application for life insurance representations and not warranties applied over common law of the chosen state which considered application statements to be warranties).[15]

It is now generally accepted that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract.[16] The

----

**15.** Maryland has also, in the Uniform Commercial Code, adopted the party autonomy theory as to transactions subject to that Code. Md. Code (1975), § 1-105 (1) of the Commercial Law Article.

**16.** Although initially criticized on principle by some commentators, 2 J. Beale, *Conflict of Laws* § 332.2 (1935); *H. Goodrich on Conflict of Laws* § 110, at 325-333 (3d ed. 1949); Minor, *Conflict of Laws* 401-02 (1901); Lorenzen, *Validity and Effects of Contracts in Conflict of Law,* 30 Yale L.J. 655, 658 (1921), courts and commentators now generally recognize the ability of parties to stipulate in the contract that the law of a particular state or states will govern construction, enforcement and the essential validity of their contract. *See, e.g.,* Sarlot-Kantarjian v. First Pennsylvania Mtg. Trust, 599 F.2d 915 (9th Cir. 1979) (contract not usurious under law chosen by the parties) (applying California conflict principles); Farris Engineering Corp. v. Service Bureau Corp., 406 F.2d 519 (3d Cir. 1969) (validity of clause limiting liability) (New Jersey choice of law); Blalock v. Perfect Subscription Co., 458 F. Supp. 123, 126 (S.D. Ala. 1978), *aff'd,* 599 F.2d 743 (5th Cir. 1979) (validity of covenant against competition)

rule has been adopted by Restatement (Second) of Conflict of Laws § 187 (1971), which in subsection (2) provides:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> > (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(applying Alabama conflict principles); National Surety Corp. v. Inland Prop., Inc., 286 F. Supp. 173 (E.D. Ark. 1968), aff'd, 416 F.2d 457 (8th Cir. 1969) (usury) (applying Arkansas conflict principles); Cooper v. Cherokee Village Development Co., 236 Ark. 37, 364 S.W.2d 158 (1963) (usury); Big Four Mills v. Commercial Credit Co., 307 Ky. 612, 211 S.W.2d 831 (1948) (usury); Cameron v. Gunstock Acres, Inc., 370 Mass. 378, 348 N.E.2d 791, 793 (1976) (validity of contract — Sunday closing law); A.S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957) (statute of frauds); Ferdie Sievers and Lake Tahoe Land Co. v. Diversified Mtg. Investors, 603 P.2d 270 (Nev. 1979) (usury); Exchange Bank & Trust Co. v. Tamerius, 200 Neb. 807, 265 N.W.2d 847 (1978) (usury); State ex rel. Meierhenry v. Spiegel, Inc., 277 N.W.2d 298, 299 (S.D.), appeal dismissed, 444 U.S. 804, 100 S. Ct. 25, 62 L. Ed. 2d 17 (1979) (usury); Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891) (usury); O'Brien v. Shearson Hayden Stone, Inc., 90 Wash. 2d 680, 586 P.2d 830, 833 (1978) (usury). Cook, 'Contracts' and Conflict of Laws: 'Intention' of the Parties, 32 Ill. L. Rev. 899, 901-13 (1938); James, Effects of the Autonomy of the Parties on the Validity of Conflict of Laws "Illegal Contracts" — Sunday, Gambling, Lottery and Other Agreements, 8 Am. U.L. Rev. 67 (1959); Reese, Choice of Law in Torts and Contracts and Directions for the Future, 16 Colum. J. Trans. L. 1, 22 (1977); Note, Commercial Security and Uniformity Through Express Stipulations In Contracts As To Governing Law, 62 Harv. L. Rev. 647 (1949). Nevertheless, the parties' ability to choose governing law on issues of contract validity is not unlimited and will not be given effect unless there is a "substantial" or "vital" relationship between the chosen situs and issue to be decided. E.g., Seeman v. Philadelphia Warehouse Co., 274 U.S. 403, 408, 47 S. Ct. 626, 71 L. Ed. 1123 (1927); Sarlot-Kantarjian v. First Pa. Mtg. Trust, supra, 599 F.2d at 917; Owens v. Hagenback-Wallace Shows Co., 58 R.I. 162, 192 A. 158 (1937); Big Four Mills v. Commercial Credit Co., supra, 307 Ky. at 622, 211 S.W.2d at 837; Continental Mtg. Investors v. Sailboat Key, Inc., 354 So. 2d 67 (Fla. App. 1977). It also has been held that an agreement will not be given effect if to do so would violate the fundamental policy of the forum or of the state with the materially greater interest in the matter. E.g., Blalock v. Perfect Subscription Co., supra; Nasco, Inc. v. Gimbert, 239 Ga. 675, 238 S.E.2d 368 (1977); State ex rel. Meierhenry v. Spiegel, supra; O'Brien v. Shearson Hayden Stone, Inc., supra. See generally Annot., 112 A.L.R. 124 (1938).

 (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

The comment on subsection (2) clarifies that an "issue ... which the parties could not have resolved by an explicit provision" is illustrated by capacity, formality and substantial validity.

Appellants contend, as a legal matter, that the Maryland Clause cannot reflect an intent that Maryland law govern interest and usury because Maryland lacks the necessary substantial relationship to the contract. They point out that the C&E was negotiated and made in New York, and is to be performed by payment in New York at Jamaica's principal place of business. In the view which we take, there are other contacts which mount up to a sufficiently substantial relationship with Maryland for the parties effectively, under Maryland conflict of laws principles, to have chosen the law of this state as to interest.

The real estate which secures the debt has its situs here.[17] The maker of Note A, as modified, and of Notes B, C and D is Twin Towers. Twin Towers is a Maryland limited partnership. More importantly, its purpose and its sole business activity were the construction and operation of Presidential Towers in Maryland. Its general partner at the time of the C&E was Americana, a Maryland corporation. At a minimum, $6,500,000 of the original indebtedness to Jamaica arises out of the construction loan, the purpose of which was to build Presidential Towers. The co-grantor

---

**17.** Appellants argue that the location in one state of the property securing the debt does not override the contractual choice of the law of another state. This argument presupposes that the parties here have chosen New York law as to interest. Appellants make no argument that the situs of the realty securing the debt may not be considered at all as a factor in determining a substantial relationship to the chosen state.

under each of the four deeds of trust was Land Corp., a Maryland corporation.

The contractual choice of the law of the state which is both the domicile of the borrower and the situs of the security, but which was not the state of contract formation or performance by payment, has been applied to determine usury questions. *Armstrong v. Alliance Trust Co.,* 88 F.2d 449 (5th Cir. 1937); *Kellogg v. Miller,* 13 Fed. 198 (D. Neb. 1881); *McDougall v. Hachmeister,* 184 Ark. 28, 41 S.W.2d 1088 (1931); *Lanier v. Union Mortgage Banking & Trust Co.,* 64 Ark. 39, 40 S.W. 466 (1897); *Dugan v. Lewis,* 79 Tex. 246, 14 S.W. 1024 (1891); *see also Harvard v. Davis,* 145 Ga. 580, 89 S.E. 740 (1916); *Arnold v. Potter,* 22 Iowa 194, 200 (1867). We hold that the transaction presented here has sufficiently substantial contacts with Maryland to permit the parties effectively to have chosen Maryland law to apply to the issue of interest and usury.[18]

Under § 187 of the Restatement, a contractual choice of law may not be violative of the fundamental policy of a state having a materially greater interest in determining the issue and which would be the state having the "most significant" (as contrasted with a "substantial") relationship to the transaction, absent the contractual choice. If it is assumed here that New York is that state, it is our opinion that legal efficacy is not denied to a selection of Maryland law, since decision of the usury issue under Maryland law would not be contrary to a fundamental policy of New York. It is for the forum to "apply its own legal principles in determining whether a given policy is a fundamental one . . . ." Restatement, *supra,* § 187, at Comment *g.* Initially, we

---

**18.** We express no opinion on the legal principles applicable if the contractual choice is of the law of a state which would invalidate, in whole or in part, the contract on usury grounds. *Compare* Hi Fashion Wigs Profit Sharing v. Hamilton Investment Trust, 579 S.W.2d 300 (Tex. Civ. App. 1979) *and* Smith v. Parsons, 55 Minn. 520, 57 N.W. 311 (1893) *with* Restatement (Second) of Conflict of Laws § 203 (1971), enunciating a special "validation" rule for usury issues, and particularly Comment *e.* Nor do we reach appellants' contention that the court below erroneously applied § 203 of the Restatement in the face of a contractual choice of New York law, since within the framework of the general contractual choice of law principles of § 187 of the Restatement, we affirm the finding that Maryland law is that which was chosen.

note that the New York statutes were amended, effective June 7, 1974, to remove any interest rate ceiling from a loan of $250,000 or more, secured by other than a one or two family residence.[19] Such a substantial change in statutory law indicates that the New York policy in August 1971 was not a fundamental one with respect to the type of large commercial transaction presented here. Further under the internal law of New York, the individual guarantor of a loan made to a shell corporation is precluded from pleading usury if the proceeds are applied in a business enterprise and not to satisfy personal obligations. *Schneider v. Phelps,* 41 N.Y.2d 238, 242-3, 391 N.Y.S.2d 568, 571, 359 N.E.2d 1361, 1364 (1977); *Jenkins v. Moyse,* 254 N.Y. 319, 172 N.E. 521 (1930).[20] In addition, under the New York conflict of laws decisions involving usury, New York's internal usury policy is not treated as so fundamental that it prevents New York courts from applying the law of another state which will validate the transaction or impose a lesser penalty on a transaction invalid under both laws. *Speare v. Consolidated Assets Corp.,* 367 F.2d 208 (2d Cir. 1966); *Wiltsek v. Anglo-American Properties, Inc.,* 277 F. Supp. 78 (S.D.N.Y. 1967); *Crisafulli v. Childs,* 33 App. Div. 2d 293, 307 N.Y.S.2d 701 (1970); *Pioneer Credit Corp. v. Catalano,* 51 Misc. 2d 407, 273 N.Y.S.2d 310 (1966), *aff'd mem.,* 28 App. Div. 2d 595, 282 N.Y.S.2d 214 (1967).

Even though the parties could, with legal effectiveness, have chosen Maryland law as to the interest aspect of their transaction, the question remains whether the parties did in fact intend by their contract to have Maryland law apply to that issue. Appellants contend that the limited purpose of the Maryland Clause in the C&E was to consolidate and make uniform the provisions of the notes and deeds of trust

---

**19.** 1974 N.Y. Laws, ch. 770, § 2; now N.Y. Gen. Oblig. Law, § 5-501.6 (McKinney 1978).

**20.** In the instant matter, a second mortgage was placed on the project in August, 1972 to secure a $300,000 loan made by Atlantic Continental Company to L.P.T. Corp., a New York corporation maintaining its office at Kronovet's law offices. Kronovet personally guaranteed the loan. It carried interest at 12% when the ceiling for other than corporations was 7.5%. Kronovet testified L.P.T. Corp. was a party to the loan transaction "in order to avoid the usury laws of New York . . . ."

for the four loans, some of which did not contain the reference to the Maryland usury statute prior to modification by the C&E.[21] While the Maryland Clause has the effect ascribed to it by appellants, it is still necessary to determine why there is any reference at all to the Maryland statutory exclusion from usury for certain commercial loans if the New York Clause is intended to carry within its terms the New York interest limitations. For purposes of this analysis we shall assume that the New York Clause refers us to the internal law of New York for principles of contract interpretation. However, we perceive no substantial difference between it and the law of this state relative to the interpretation of the two clauses.[22]

The court below rendered findings of fact including finding the ultimate fact that "the parties intended all matters of interest and usury pertaining to the secured indebtedness . . . to be governed by the laws of the State of .Maryland." The findings of the trial court are fully supported by evidence relating to pre-closing, closing and post-closing conduct of the parties and by the expert testimony.

Shortly after Jamaica had committed, John Bond ("Bond"), the attorney for Jamaica, contacted Franklin Bass ("Bass"), the attorney for Twin Towers. Bond told Bass that an opinion of Maryland counsel would be required, at the expense of Twin Towers, since "this was a Maryland

---

**21.** Prior to the closing of the permanent loan, the notes held by Guardian (loans A and C) did not contain the reference to Art. 49, § 7, but the deeds of trust securing those notes contained that reference. In the AS&T loans (B and D) the Art. 49, § 7 reference appears in the notes but not in the deeds of trust.

**22.** Where several constructions of a contract are possible, New York courts can look to the surrounding circumstances and facts to determine the intent of the parties. 67 Wall Street Co. v. Franklin Nat. Bank, 37 N.Y.2d 245, 249, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (1975); Becker v. Peter A. Frasse & Co., 255 N.Y. 10, 14, 173 N.E. 905, 906 (1930) (Cardozo, J.). If there is conflict or inconsistency between general provisions and specific provisions of a contract, the specific provisions qualify the meaning of the general provisions. William Higgins & Sons, Inc. v. State, 20 N.Y.2d 425, 428, 284 N.Y.S.2d 697, 699, 231 N.E.2d 285, 286 (1967). New York courts will seek to give to each clause its intended purpose in the promotion of the primary and dominant purposes of the contract. Empire Properties Corp. v. Mfg. Trust Co., 288 N.Y. 242, 248, 43 N.E.2d 25, 28 (1942).

transaction involving Maryland law — as to interest . . . ." Bass replied, according to Bond, that Bass understood, inasmuch as it was a Maryland transaction. The opinion of Maryland counsel was by letter dated March 9, 1971 which stated, in part, that the proposed transaction "does not constitute a usurious transaction under the Law of Maryland." A similar opinion from Maryland counsel was obtained one week before closing. Bond also sent to Bass and his legal colleague, Bernard Jacobs ("Jacobs"), a draft of the C&E containing the Maryland Clause. Bond testified that in a subsequent discussion Bond told Jacobs that the Maryland Clause was "for the purpose of making it absolutely clear that this was not a usurious transaction but rather excepted therefrom by Section 7 of Article 49 . . .", and that Jacobs responded by saying that he understood the inclusion was because of the usury factor of Maryland law.

At the closing, Bond became involved in a discussion with the representative of the mortgagee title insurer who was conducting the closing. The proposed form of title policy contained an exclusion for usury. Bond was urging removal of the exclusion so that coverage would be consistent with the form of policy in use in New York. Jacobs, and Ronald Unger, an attorney at Kronovet's law firm who was representing the limited partners of Twin Towers at the closing, interrupted the discussion. Bond testified they in effect said to him as follows:

What the hell are you objecting to, Jack?

You know damn well this is a Maryland transaction. We want to close the damn thing, and being a Maryland transaction, we have already got the Article 49 statement in the Consolidation and Extension Agreement regarding what portion of the Maryland law it falls under.

You've got an opinion of counsel telling you it is not usurious, and this is a Maryland transaction on Maryland real estate. So, would you stop arguing

and please let's get on with the closing utilizing the ALTA form.

On April 25, 1972 the trustees under the deeds of trust securing Loans A through D, the nominee for Presidential, Twin Towers and Jamaica entered into a modification of the C&E in order to permit Twin Towers to defer interest up to $100,000. The deferred interest was to bear interest at an increased rate over the 8.375% of the C&E. In connection with the modification, Bond requested of Ronald Unger, representing Twin Towers, that an opinion of Maryland counsel on the question of usury be obtained. Bond states Unger agreed that the opinion was necessary because it was a Maryland transaction. Maryland counsel opined that the modification was not usurious under Maryland law. Appellants also received from Jamaica annual statements of mortgage account, without making objection on the ground of usury.

The trial court also held that the parties to the transaction "by which Jamaica purchased by assignment the existing indebtedness . . . intended that the existing indebtedness . . . would be valid and binding in all respects and there was no intention on the part of the parties to enter into or to create an invalid or usurious transaction." That finding is supported not only by the admissions reviewed above, but also by the form of the transaction. Motivated at least in part by the desire to avoid recordation and transfer taxes,[23] Jamaica purchased existing notes secured by existing deeds of trust. The note for Loan A, as modified, and the other three notes, all contained provisions adopting Maryland law under which the loans were not usurious. The trial court could properly infer that the parties did not intend to make invalid that which was previously valid or intend that the New York Clause prevail over the more specific Maryland Clause in the C&E. When one considers that Twin Towers under the C&E was obtaining an extension from December 31, 1971 to August 25, 1994 during which to pay the

---

**23.** Howard County v. Howard Research and Development Corporation, 34 Md. App. 411, 367 A.2d 18 (1977); 49 Op. Md. Att'y. Gen. 511 (1964).

indebtedness, and was achieving a reduction to 8.375% in the rate of interest from the 8.75% under the AS&T loans and from the 14% under the Guardian loans, the trial court's finding was entirely permissible.

Expert testimony also supported the decree.

## The Expert Testimony

Jamaica called Frank T. Gray, a member of the bar of this Court, who qualified as an expert in mortgage transactions. He described certain practices in commercial lending. Appellants assign as error that the witness was allowed, over objection, to express an opinion on the precise issue before the court. When asked what he concluded from the presence of the Article 49 provision in the C&E, Mr. Gray said "that the parties understood clearly and intended that the Maryland law should govern usury questions and that the transaction would fall within the qualifications of Article 49, Section 7 pertaining to commercial trans- actions . . . ."

Even if it is assumed that this testimony was not admissible, it is clear that there is no prejudice warranting reversal in the circumstances of this case. *Beahm v. Shortall*, 279 Md. 321, 332, 368 A.2d 1005, 1012 (1977). Immediately following the above answer the witness was asked, without objection, for the basis of his opinion. He repeated his belief that the sole purpose of the provision was in connection with Maryland usury law and said his view was strengthened by Jamaica's requirements for the opinions of counsel on Maryland usury law and by the testimony of Bond concerning the discussion at settlement about the form of title policy. Then, without objection or motion to strike, this testimony was elicited:

Q. Mr. Gray, would your last answer change in any material respect if you did not place any reliance on the testimony of Mr. Bond that you mentioned and the colloquy at the closing?

A. No. For the reasons I indicated, either of those

circumstances standing alone would be clearly sufficient to sustain my opinion that the parties understood that Maryland law would govern.[24]

The holding in *Robeson v. State,* 285 Md. 498, 507, 403 A.2d 1221, 1225-1226 (1979) is on point.

The law in this State is settled that when a witness later gives testimony, *without objection,* which is to the same effect as earlier testimony to which an objection was overruled, any error in the earlier ruling is harmless. [Emphasis in original].

Appellants further complain that they were prevented from cross-examining Mr. Gray concerning statements which one of Gray's law partners may have made to him about a conversation between that law partner and Ronald Unger. Objections to the line of questioning were properly sustained since the answers would have been hearsay. The law partner was not called.[25]

For the foregoing reasons we conclude that Maryland law governs and that the transaction is not usurious.

### Pre-Judgment Interest

One of the conclusions of law by the trial court was that "Jamaica is entitled to interest at the rate of 8⅝% on the secured indebtedness until payment in full, or at least until ratification of the auditor's report subsequent to the foreclosure sale of the mortgaged property." This determination relates to a provision of the C&E which reads as follows:

20. In the event of a default or breach of any provisions of this mortgage or the obligation, by

---

**24.** Another expert called by Jamaica, in response to questioning by the court, gave an opinion much like that of Mr. Gray. Appellants do not challenge the admission of that evidence on this appeal.

**25.** Mr. Gray testified there was no attorney-client relationship between his firm and appellants.

reason of which the obligation is accelerated and becomes due and payable, interest from the date of default or breach shall *thereafter* be payable at the maximum legal rate of interest then permitted for mortgage loans or the interest rate as set forth in the obligation . . . secured by the mortgage herein, whichever is higher. [Emphasis added].

Appellants' attacks on the trial court's conclusion are aimed at reducing pre-judgment interest to 6%. One attack is based on New York law and seeks the reduction as of the date of default, said by appellants to be June 2, 1975. Alternatively, appellants say that under Maryland law the Jamaica claim merged into the decree of May 7, 1979 with 6% interest from that date.[26]

In support of their first argument, appellants say that the New York Clause of the C&E (". . . this agreement shall be enforced under, and in accordance with the laws of the State of New York . . .") governs questions of contract interpretation and that paragraph 20 would, in New York, be interpreted as failing to extend the contract rate of interest beyond the scheduled or accelerated maturity of the debt.[27] Specifically appellants contend that a covenant to pay post-maturity interest at a rate other than 6% is ineffective unless it expressly includes " 'until payment' "

**26.** Md. Code (1980 Repl. Vol.), § 11-106 of the *Courts and Judicial Proceedings Article*, relating to contract interest on judgments arising from a loan of money, does not apply to any loan secured by a mortgage or deed of trust.

**27.** By urging that the issue is one of contract interpretation, appellants choose narrow ground on which to stand. On the surrounding terrain are questions as to which we imply no opinion. These questions include whether entitlement to post-default, pre-judgment interest is a matter of measure of recovery in contract and, if so, whether, because of the Maryland Clause and under Restatement (Second) of Conflict of Laws (1971), § 207 and Comment e thereto, the internal law of Maryland should control. The 6% pre-judgment rate which New York courts apply, in the absence of an effective agreement on post-default interest at a different rate, is set by N.Y. Civ. Prac. Law § 5004 (McKinney 1963, 1979 Supp.), as amended by 1972 N.Y. Laws, Ch. 358, § 1. The rate in § 5004 is the rate both for interest on judgments (§ 5003) and on "a sum awarded because of a breach . . . of a contract . . ." (§ 5001 (a)). As to the difficulties arising from the difference between the rate set by the Banking Board under the New York Gen. Oblig. Law and that of New York Civ. Prac. Law, § 5004, see the Supplementary Practice Commentaries to § 5004, N.Y. Civ. Prac. Law, *supra,* at 284-87.

verbiage. They rely on *In re Realty Associates Securities Corporation,* 163 F.2d 387, 389 (2d Cir.), *cert. denied,* 332 U.S. 836, 68 S. Ct. 218, 92 L. Ed. 409 (1947) which involved post default interest on bonds, where the court said

> It is common ground that under the New York decisions interest continues at the specified contract rate rather than at the legal rate of 6%, if the contract provides for payment of interest "until the principal shall be paid."

Because the indenture there referred to interest at 5% until the bonds were "duly" paid, the district court had held that 5% was payable only up to the due date, and that 6% was payable after maturity. In rejecting this contention, the Second Circuit pointed to a provision under which monies collected after default (including non-payment at maturity) were to be applied to payment of principal and interest then owing, with interest at 5% " 'on the overdue principal' " and observed that "this provision leaves no doubt about the trustee's right to collect only 5% interest after maturity . . . ." *Id.* at 390.

The " 'overdue principal' " reference relied upon by the Second Circuit can be equated with the word "thereafter" appearing in paragraph 20 of the instant C&E, since neither explicitly states any "until payment" termination of the contract interest obligation. Also paragraph 18 of the C&E which in part deals with remedying by the mortgagee of defaults by the mortgagor, without opting acceleration, states

> that the mortgagor will pay to the mortgagee on demand, *together with interest at the rate payable on unpaid principal,* all sums that may be advanced or liability for which may be incurred by the mortgagee . . . either to remedy default by the mortgagor or to defend or preserve the rights and liens created by said bond or note, mortgage and any extension agreement . . . . [Emphasis added].

The more recent New York decisions do not reflect the

pattern which one would expect to find if "until payment" verbiage were essential to the allowance of contract interest before judgment. "Until payment" provisions appeared in the documents involved in *Stull v. Joseph Feld, Inc.,* 34 App. Div. 2d 655, 309 N.Y.S.2d 985 (1970) and in *Astoria Fed. Sav. & Loan Ass'n v. Rambalakos,* 49 App. Div. 2d 715, 372 N.Y.S.2d 689 (1975), in each of which contract interest was allowed. Without discussion of the terms of the contract documents, contract interest was allowed in *Costikyan v. Keeffe,* 54 App. Div. 2d 573, 387 N.Y.S.2d 136 (1976) and disallowed in *Jamaica Savings Bank v. Halimi,* 76 Misc. 2d 939, 351 N.Y.S.2d 902 (Civ. Ct. 1974). *Secular v. Royal Athletic Surfacing Co.,* 66 App. Div. 2d 761, 411 N.Y.S.2d 615 (1978), *appeal dismissed,* 46 N.Y.2d 1075 (1979) describes the contract as providing for interest at 1.5% per month in the event of default, without specifying until payment, and allows the contract interest. *Jamaica Savings Bank v. Toomey,* 77 Misc. 2d 887, 355 N.Y.S.2d 268 (Sup. Ct.), *aff'd mem.,* 46 App. Div. 2d 847, 363 N.Y.S.2d 313 (1974) does not set forth any critical language of the loan documents but applies 6% following default on a mortgage. It states the rule to be that contract interest applies prior to maturity but that thereafter the legal rate applies, "[i]n the absence of an agreement to the contrary by the parties . . . ." *Id.* at 889, 355 N.Y.S.2d at 271. *Toomey* was interpreted by the United States District Court for the Southern District of New York as an application of discretion in an equity proceeding on which ground that federal court sustained the allowance of 8.5% pre-judgment interest on a defaulted mortgage, without presenting in the opinion any contract provisions. *In re Hartsdale Associates,* 452 F. Supp. 67 (S.D.N.Y. 1978).

The contract documents are quoted in the opinions in the following New York cases and the result is antithetical to appellants' position. *Bloom v. Trepmal Construction Corp.,* 29 App. Div. 2d 951, 289 N.Y.S.2d 447, *aff'd on other grounds,* 23 N.Y.2d 730, 296 N.Y.S.2d 372, 244 N.E.2d 62 (1968), reversed the award of 6% pre-judgment interest in a suit on a note which provided that " 'Interest in [*sic*] the

indebtedness evidenced by this note after default or maturity shall be due and payable at the rate of (2)% per month.'" The provision was held to be "a valid and enforceable" one. *Id.* at 951, 289 N.Y.S.2d at 448. A stipulation of settlement was involved in *Williamson & Co. v. Colby Engraving & Rubber Plate Corp.,* 98 Misc. 2d 134, 413 N.Y.S.2d 580 (1979). The stipulation provided for settlement at $20,000 "with 7.5% interest" and on default by the defendant, plaintiff had the right to enter judgment for the $20,000 "together with interest . . . ." Contract interest was allowed and the court summarized the status of New York law as follows:

> Thus, the holding of the courts in matters affecting the interest rates appear to be uniform. Until the entry of judgment the rate of interest shall be fixed at the contractual rate. Subsequent to judgment, CPLR 5004 will prevail. [*Id.* at 136, 413 N.Y.S.2d at 582.]

We conclude that paragraph 20 of the C&E provides for pre-judgment interest at the contract rate and that New York law, if applicable, does not mandate a construction to the contrary.

Appellants next argue that, even if the C&E provides for 8.375% after default and maturity by acceleration, the rate drops to 6% on May 7, 1979 because Jamaica's claim is merged in the decree below. We do not agree.

In these consolidated actions to obtain possession of the property with an accounting for rents, and to foreclose the consolidated deeds of trust, the trial court determined in the May 7, 1979 decree that the indebtedness of loan principal, advances for taxes and interest, as of January 1, 1979, was $9,986,213.64 "with no provision being made as to the disbursement of the amounts held by Jamaica in the Special Deposit Miscellaneous Account and the Escrow Account . . . ." Relief by way of the requested accounting has not been determined and the Rule 605 a certification was expressly without prejudice to further proceedings by Jamaica. Thus, the determination of indebtedness as of January 1, 1979 is

not the entry of an *in personam* monetary judgment in the Possession Action. "[A] valid and final personal judgment . . . rendered in favor of the plaintiff" is required in order to effect a merger with the result that the "plaintiff cannot thereafter maintain an action on the original claim or any part thereof, but he can maintain an action upon the judgment . . . ." Restatement (Second) of Judgments § 47 (Tentative Draft No. 1, 1973).

Nor has there been any merger in the Foreclosure Action. The finding of the indebtedness as of January 1, 1979 is a way of expressing the result, as of that date, flowing from the rejection by the circuit court of defenses asserted by appellants, but the parties have not advised us of the significance of the date, nor do we discern it. It is clear from the decree that the January 1, 1979 figure is not intended to be the indebtedness to be utilized in determining a deficiency, if any, since the decree states that Jamaica is entitled to the contract rate of interest "until payment in full, or at least until ratification of the auditor's report . . . ."[28] Here, there has been no foreclosure sale, no ratification of the sale, no statement of the auditor's account and no final ratification of the auditor's report and account. Under Maryland practice, if a foreclosure proceeds through those stages and there is a deficiency, and if the mortgagee is otherwise entitled to a deficiency decree (a possible future issue between the parties here as to which we intimate no opinion), the mortgagee may sue for the deficiency in an action distinct from the foreclosure proceedings. *Katz v. Simcha Company,* 251 Md. 227, 237-38, 246 A.2d 555, 561 (1968); *Brown v. Fraley,* 229 Md. 445, 452, 184 A.2d 710, 714 (1962); *Mizen v. Thomas,* 156 Md. 313, 144 A. 479 (1929); *Andrews v. Scotton,* 2 Bland 629, 665-66; Slingluff, *Mortgagee's Rights in the Event of a Deficiency,* 1 Md. L. Rev. 128, 129 (1937); *see, e.g., Walde v. Capital Mortgage Investments,* 286 Md. 343, 407 A.2d 1143 (1979). *A fortiori,* there has been no merger of Jamaica's claim in the May 7, 1979 decree.

---

**28.** *Cf.* Ex Parte Aurora Federal Savings and Loan Ass'n., 223 Md. 135, 162 A.2d 739 (1960); Riggs National Bank v. Welsh, 254 Md. 207, 254 A.2d 172 (1969).

*Justiciability*

Appellants' contention that Jamaica's claim merged into the decree below is, however, secondary and alternative. The primary position appellants take concerning the judgment is that it is a nullity because there were no justiciable issues. The lack of justiciability is said to result from the nature of the modification by the bankruptcy court of its stay of the Possession Action. In its order filed March 10, 1978 the bankruptcy court found that "the determination of the issues currently before [the circuit court] will assist the Bankruptcy Court in the resolution of issues that will have to be determined in the Chapter XII proceedings," found that "[j]udicial economy will be furthered by a prompt determination by the Maryland court of the remaining issue in the Possession Action . . ." and ordered that the stay be modified "to permit the completion of the Possession Action." Appellants say that the "state trial court apparatus, in effect, was loaned" to the bankruptcy court, that the decree below could not, of itself, have effected a change of possession of the project or permitted a foreclosure to proceed, and that "the bankruptcy judge was free to accept, reject or modify" the trial court's findings. Appellants invite this Court to announce as a matter of judicial policy that where the determination of the trial court cannot be implemented without further order by the bankruptcy court, the issues presented to the trial court are not justiciable.

"We have adopted, as the definition of a justiciable issue or controversy, that given in 1 W. Anderson, *Actions for Declaratory Judgments* 67 (2d ed. 1951): 'A controversy is justiciable when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded.' " *Reyes v. Prince George's County,* 281 Md. 279, 288, 380 A.2d 12, 17 (1977). These elements are fully present in the matter at hand. A justiciable controversy exists where "a legal decision is sought as to the construction of a provision of a contract already executed," *Layman v. Layman,* 282 Md. 92, 95, 382 A.2d 584, 586 (1978), under which one party asserts

present rights which the other party asserts are legally invalid.

But appellants assert that because the trial court could not affect a change of possession from Twin Towers, the debtor in possession under Chapter XII, and because Jamaica's trustees could not proceed to foreclosure sale under the powers of sale in the deeds of trust, there is lacking "the essence of judicial power [which] is the final authority to render and enforce a judgment . . . ." *Attorney General v. Johnson,* 282 Md. 274, 286, 385 A.2d 57, 64 (1978). In *Johnson* we held that under the Health Care Malpractice Claims statute [29] the requirement of submission of certain of such claims to an arbitration panel for initial ascertainment of liability and damages before resort might be had to a court of law for final determination involved no violation of Maryland Constitution, Art. IV, § 1 or of the Maryland Declaration of Rights, Art. 8. In that context we stated "that an entity does not exercise the sovereign power of the State constitutionally assigned to the judiciary if its decision is in *no* sense final, binding or enforceable. . . ." *Id.* at 287, 385 A.2d at 65. (Emphasis in original). Here, as we shall demonstrate, *infra,* the determinations of the trial court are to be recognized in bankruptcy as a judgment of the Circuit Court for Prince George's County, Maryland. The "judicial function may be appropriately exercised although the adjudication of rights of the litigants may not require the award of process or payment of damages." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 241, 57 S. Ct. 461, 464, 81 L. Ed. 617, 622, 108 A.L.R. 1000 (1937). Nor should judicial discretion be exercised to refuse a declaratory judgment "merely because it may be preliminary to further litigation, if it terminates and decides the particular legal question at issue." *Commissioners of Cambridge v. Eastern Shore Public Service Co.,* 192 Md. 333, 341, 64 A.2d 151, 155 (1949). The reason why the court below could not immediately proceed in accordance with its determinations is that Congress had provided that the bankruptcy court

---

**29.** Md. Code (1974, 1977 Cum. Supp.), §§ 3-2A01 to 3-2A09 of the Courts and Judicial Proceedings Article.

"shall, for the purposes of [Chapter XII], have exclusive jurisdiction of the debtor and his property . . . ." Act of July 1, 1898, c. 541, § 411, as amended by Act of June 22, 1938, c. 575, § 1, 52 Stat. 917 (codified in 11 U.S.C. § 811 (1976)) (repealed 1978). The bankruptcy court has "power, in its discretion, to permit the determination of specific matters or issues in a non-bankruptcy court." 1 *Collier on Bankruptcy* § 2.07, at 162 (14th ed. 1978); *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 483-84, 60 S. Ct. 628, 630, 84 L. Ed. 876, 880 (1940). Simply because the bankruptcy court controls the debtor and his property does not render non-justiciable those issues which the bankruptcy court has permitted to be determined by a non-bankruptcy court.

Appellants say that their "central thesis" is that the bankruptcy judge was free to reject the findings of the trial court in this case, because the particular order modifying the stay requested only the assistance of the state court and did not ask for the rendition of a judgment. We do not read the order of the bankruptcy court as supporting this contention. It clearly called for a "determination" by the court below in the Possession Action and permitted "completion" of that action. Consistent therewith the trial court has determined that Jamaica is entitled under the facts and the contract documents to possession of the property and to proceed to foreclosure, and that the defense of usury does not lie. The bankruptcy court is not to re-examine the issues determined by the judgment of the Circuit Court for Prince George's County, Maryland in this matter, *Heiser v. Woodruff,* 327 U.S. 726, 736, 66 S. Ct. 853, 858, 90 L. Ed. 970, 978 (1946), but should give collateral estoppel effect to the decision below, *Brown v. Felsen,* 442 U.S. 127, 139 n. 10, 99 S. Ct. 2205, 2213 n. 10, 60 L. Ed. 2d 767, 776 n. 10 (1979).[30] Thus, the judgment appealed from is not merely advisory but decides justiciable issues.

In view of our affirmance, it is unnecessary to rule upon appellees' motion to dismiss the appeal.

*Decree affirmed; appellants to pay the costs.*

---

**30.** *Brown* left open the application of collateral estoppel to dischargeability.