**Simon A. HERSHON, et al., Appellants,**

v.

**GIBRALTAR BUILDING & LOAN ASSOCIATION, INC., et al., Appellees.**

**Nos. 87–7009, 87–7010, 87–7058, 87–7063 and 87–7066.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1988.

Decided Jan. 6, 1989.

Nelson Deckelbaum, Washington, D.C., for appellants/cross-appellees Simon A. Hershon, et al.

Rebecca J. Habbert, Washington, D.C., for appellants/cross-appellees Anton Vierling and Jacqueline Vierling.

---

Gilbert B. Weiner, with whom John J. Kelly and Irwin R. Kramer, Baltimore, Md., were on the brief, for appellees/cross-appellants Gibraltar Building & Loan Ass'n, et al.

Before EDWARDS, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge WILLIAMS.

BUCKLEY, Circuit Judge:

Simon A. Hershon, Leo and Nina Hershon, and Anton and Jacqueline Vierling appeal the district court's judgment holding them liable to Gibraltar Building and Loan Association, Inc., for a total of $265,162, the amounts payable on certain promissory notes secured by deeds of trust on property located in the District of Columbia. The trial court ruled that these obligations were not cancelled by a release agreement executed by the parties. The Hershons and the Vierlings argue that the district court erred in not giving effect to the release's clear language and in considering extrinsic evidence that contradicted the contract's plain meaning. We conclude that the agreement unambiguously released and discharged all claims between the parties—including those evidenced by the notes and deeds at issue. Therefore, we reverse.

## I. BACKGROUND

These consolidated cases involve obligations incurred in connection with the purchase, in July and December of 1981, of three units in the Admiral Dupont condominiums in Washington, D.C. These obligations are represented by promissory notes executed by appellants Simon A. Hershon, his brother Leo and sister-in-law Nina, and Anton Vierling and his wife Jacqueline. The notes are payable to appellee Gibraltar Building and Loan Association, Inc. ("Gibraltar"), and are secured by deeds of trust in which Gibraltar's president, appellee Lawrence B. Goldstein, is named as a co-trustee.

Simon Hershon, Anton Vierling, and Goldstein had long been involved in an intricate web of business and financial transactions. Their relationship deteriorated, however, and Hershon and Vierling engaged in a series of bitter business disputes with Goldstein that eventually culminated in five lawsuits. Subsequently, Simon and Leo Hershon, Vierling, Goldstein, Gibraltar, and various business associates and affiliates entered into a Mutual Release and Discharge Agreement ("Release") dated August 24, 1984. The Release contains the following relevant provisions:

1. ...

(d) The term "Claims" shall mean and refer to any actions, causes of action, suits, debts, dues, liens, sums of money, accounts, reckonings, specialities, covenants, promises, judgments, expenses, costs, attorneys' fees, liabilities, claims for relief, proceedings, debts, contracts, damages, defenses, obligations, responsibilities, demands and interest of any kind or nature whatsoever, known or unknown, tangible or intangible, fixed or contingent.

2. [The parties release and discharge each other] absolutely, unconditionally and forever ... from any and all Claims, whether in law or in equity, or both, which, against each of the Releasees, the Dischargees, and against each of the Dischargees, the Releasees, ever had, or has or hereinafter can, shall or may have, for or by reason of any matter, cause or thing whatsoever, to and including the date of execution hereof, specifically including, but not limited to, any matters which arise directly, indirectly and/or derivatively, from and with respect to, and/or which are based upon and/or arise out of any matter whatsoever (including the execution and delivery of this Release) involving and/or concerning Gibraltar, IFS, M–AFSLP and/or 633 JV [business entities described in ¶ 1(a) and (b)]; provided, however, that RFS and Gibraltar specifically exclude and reserve from this Mutual Release and Discharge

any claims ... for bills allegedly due and owing for accounting services.

. . . . .

4. It is expressly agreed that this Mutual Release and Discharge is, and shall be, a full and complete termination, settlement and satisfaction of any and all Claims alleged and matters in dispute in [five pending cases].

. . . . .

6. Except as herein set forth, it is the specific intent and purpose of the parties hereto to release and discharge each and the other from any and all Claims of any kind or nature whatsoever, whether known or unknown, whether specifically mentioned herein or not, which may exist or might be claimed to exist either directly, indirectly and/or derivatively, at, upon, or prior to the date hereof, or which may in the future arise by reason of any association or relationship of any kind or nature existing or claimed to exist among the parties, and the parties do hereby waive any right or claim to hereafter assert that any Claim of any nature or kind whatsoever has been, through oversight or error, or intentionally or unintentionally, omitted from this Mutual Release and Discharge.

. . . . .

12. This Mutual Release and Discharge sets forth all (and is intended by all parties hereto, together with the other documents and transactions executed simultaneously herewith, to be an integration of all) of the promises, agreements, conditions, understandings, warranties and representations among the parties hereto with respect to Gibraltar, IFS, 633 JV and/or M–AFSLP [being four among the more than twenty individuals, corporations, and partnerships listed in paragraph 1(a) and (b) as "Releasees" or "Dischargees"], and there are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, except as set forth herein.

Contending that this Release discharged all claims and debts among the parties, the Hershons and Vierlings refused to tender the payments due October 1, 1984 on the promissory notes. On November 1, 1984, Gibraltar notified appellants that if they refused to pay the amounts owed, Gibraltar would declare a default and accelerate the balances under the deeds of trust, which would become due in full on December 2, 1984. Gibraltar interpreted the Release as settling only matters "in dispute," as identified in the Release (i.e., the cases listed in paragraph 4) and in its integrated documents and transactions (¶ 12), which contain no reference to the Dupont obligations.

On November 27, 1984, the Hershons sued Gibraltar in the Superior Court for the District of Columbia, alleging that the Release discharged the Dupont promissory notes and trust deeds and requesting a declaratory judgment that would require Gibraltar to release the deeds and to treat the debt as satisfied. Gibraltar had the case removed to the United States District Court for the District of Columbia, which had diversity jurisdiction under 28 U.S.C. § 1332 (1982). Gibraltar also counterclaimed for the balance of the Hershons' debt and for costs and attorneys' fees incurred to defend the lawsuit.

On November 30, 1984, the Hershons offered to pay their past debt. Gibraltar rejected this payment because the Hershons refused to include the attorneys' fees that they allegedly owed the bank.

Meanwhile, the Vierlings continued to withhold their payments until December 31, when Anton Vierling tendered a check for the amount due under protest and notified Gibraltar that he would sue the bank for breaching the Release. Gibraltar refused to accept payment on the ground that it was conditional.

On January 3, 1985, the Vierlings filed a complaint against Gibraltar that was nearly identical to the one previously lodged by the Hershons. Again, Gibraltar had the case removed and counterclaimed. Three months later, the two cases were consolidated for trial, which began on March 3, 1986.

In a bench opinion issued March 25, 1986, the district court noted that the case in-

volved a dispute over the meaning of the word "Claims" in the Release, but made no factual findings concerning possible ambiguities in the agreement. Nevertheless, the court asserted that the contract was "ambiguous on its face" because it was unclear whether "Claims"´referred to "any and all Claims" as broadly defined in paragraph 1 or only to the specific claims arising out of the lawsuits enumerated in paragraph 4 and the integrated documents mentioned in paragraph 12. Based on its evaluation of evidence derived from the parties' settlement negotiations and their subsequent conduct, the court further concluded that the parties intended to resolve only the specific matters described or referred to in the Release, "despite the terms of the agreement which are very strong." Therefore, the court held that the Release did not discharge the Dupont condominium promissory notes and deeds of trust.

The court reached its conclusions by applying Maryland law, as provided in paragraph 11 of the Release. Specifically, the court relied on *Admiral Builders Savings & Loan Ass'n v. South River Landing*, 66 Md.App. 124, 502 A.2d 1096 (Ct.Spec.App. 1986) (*"Admiral Builders"*), which had ruled that a trial judge may consider extrinsic evidence both to determine whether a contract ambiguity existed (unless that evidence varied, altered, or contradicted the writing's clear meaning) and to resolve any ambiguity by ascertaining the parties' intent. The district court acknowledged that if no facial ambiguity existed, parol evidence should be excluded. Applying the *Admiral Builders* methodology, the trial court found the Release unclear and relied on extrinsic evidence to conclude that the parties did not intend to cancel the Dupont obligations.

On March 27, 1986, the court entered its final order summarizing its findings and rulings on the liability issue. On cross-motions for summary judgment on the damages issue, the court on December 23, 1986 found the Hershons and Vierlings liable to Gibraltar for $265,162. On March 6, 1987, the district court denied Gibraltar's motion to amend the Vierling judgment to include certain interest expenses.

The Hershons and the Vierlings have appealed the district court's judgment on the liability and damages issues, and Gibraltar has cross-appealed the denial of its motion to amend.

## II. DISCUSSION

### A. Contract Interpretation and the Parol Evidence Rule

Because federal jurisdiction rests on diversity in this case, state substantive law must be applied. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties agreed, in paragraph 11, that Maryland law would govern the construction and enforcement of the Release. *See Kronovet v. Lipchin*, 288 Md. 30, 43, 415 A.2d 1096, 1104 (1980) (approving such contractual provisions). Maryland has consistently refused to adopt the "subjectivist" approach championed by Arthur Corbin (*Contracts* § 572B (Supp.1971)), the American Law Institute (2 *Restatement (Second) of Contracts* § 202 and Comment c, § 212 and Comment b (1981)), and our dissenting colleague. Instead, it adheres to the traditional "objective" test in interpreting contracts: where an agreement's language is clear, judges must give effect to its plain meaning, as understood by reasonable people in the parties' position—regardless of what the parties subjectively thought or intended. *Billmyre v. Sacred Heart Hosp.*, 273 Md. 638, 642–43, 331 A.2d 313, 316–17 (1975). *See* E.A. Farnsworth, *Contracts* 485 n. 7 (1982) (citing *Billmyre* as exemplifying "objectivist" view). Where contractual terms are unambiguous, resort to extrinsic evidence is barred. *Kasten Constr. Co. v. Rod Enters.*, 268 Md. 318, 327–29, 301 A.2d 12, 17–18 (1973).

Indeed, Maryland courts steadfastly apply the parol evidence rule, which prohibits the use of extrinsic evidence (e.g., prior negotiations) to contradict a final, written agreement, and admits of but a few narrow exceptions. *See, e.g., Rinaudo v. Bloom*, 209 Md. 1, 120 A.2d 184 (1956) (reaffirming parol evidence rule, but acknowledging exception to demonstrate *consideration* supporting contract). Maryland case law re-

veals a judicial unwillingness to use external evidence to interpret facially explicit contractual terms. *See, e.g., Walker v. Associated Dry Goods Corp.*, 231 Md. 168, 179, 189 A.2d 91, 97 (1963); *Kasten*, 268 Md. at 327–29, 301 A.2d at 17–18.

Nonetheless, in making the initial determination of whether an agreement is ambiguous, a court may consider extrinsic evidence in certain instances. To cite the classic example, although a contract providing for a delivery "to arrive [on the ship] Peerless from Bombay" may appear clear on its face, a court may admit extrinsic evidence to show the existence of two ships named "Peerless" and to identify the one referred to. *See Raffles v. Wichelhaus*, 2 Hurl. & C. 906, 159 Eng.Rep. 375 (Ex. 1864). When, however, the offered evidence fails to convince a judge that the contract is ambiguous or when it "varies, alters, or contradicts the clear meaning of the writing," such evidence must be excluded. *Admiral Builders*, 66 Md.App. at 131, 502 A.2d at 1100. Conversely, if the external evidence can be construed consistently with the agreement's language, the court may use such data to decide whether any ambiguity exists. *Id.*

In sum, *Admiral Builders* requires that extrinsic evidence reveal an ambiguity *in the contract's language* and prohibits the use of parol evidence to contradict the clear, ordinary meaning of the contract's words. Although the district court purported to apply *Admiral Builders*, it failed to identify any facts or external evidence to support its conclusion that the Release was *facially* ambiguous—a point conceded by appellees at oral argument. Instead, the court erred by relying on parol evidence that contradicted the agreement's clear language (releasing "all Claims") and plain meaning, as discussed below.

## B. *Contractual Analysis*

The appropriate standard of review is a procedural question governed by federal law, even in diversity cases. Although appellate courts must review a trial court's factual findings under the restrictive "clearly erroneous" standard, Fed.R.Civ.P.

52(a), a ruling that a contract contains facial ambiguities is a question of law subject to *de novo* review. *See, e.g., Washington Metro. Area Transit Auth. v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C.Cir.1980) ("the question of interpreting the plain language of a contract is a question of law ... and appellate courts are not limited to the clearly erroneous standard of review unless extrinsic evidence was [properly] utilized").

We conclude that the Release is unambiguous. Its clear, comprehensive language provides for the release and discharge of "any and all Claims" (¶ 2, ¶ 6), "of any kind or nature whatsoever, whether known or unknown, whether specifically mentioned herein or not, which may exist or might be claimed to exist ... or which may in the future arise by reason of any association or relationship ... among the parties." ¶ 6. This terminology echoes paragraph 1(d), which defines "Claims" to include debts, liens, contracts, promises, and obligations "of any kind or nature whatsoever, known or unknown, tangible or intangible, fixed or contingent." As if to remove any possible doubt as to the scope of the Release, the parties waived the right to "assert that any Claim of any nature or kind whatsoever has been, through oversight or error, or intentionally or unintentionally, omitted." ¶ 6.

Despite this sweeping language, appellees argue that paragraph 6 does not resolve two ambiguities. First, they contend that it is unclear whether the Release discharged "all Claims" as expansively defined in paragraph 1(d) or only those specific matters "in dispute" (i.e., the lawsuits enumerated in paragraph 4). Second, appellees assert that paragraph 6 is at odds with paragraph 12 which, they argue, provides that there are no express or implied promises or agreements, except as set forth in the Release and its integrated documents and transactions—all of which pertain to disputed items, and none of which mention the Dupont condominium notes and deeds.

We are unpersuaded by these arguments. We find nothing in paragraphs 4 or

that can reasonably be interpreted to except the Dupont obligations from the expansive reach of paragraph 6, which declares that "[e]xcept as herein set forth, it is the specific intent and purpose of the parties ... to release and discharge each and the other from *any and all Claims* of any kind or nature whatsoever, ... *whether specifically mentioned herein or not*" (emphasis added). The fact that paragraph 4 listed pending litigation, or that the integrated documents referred to in paragraph 12 settled certain disputed matters and debts, does not mean that obligations and documents not expressly mentioned or integrated were not released. Clearly, if the parties had intended to exclude the Dupont notes and deeds from the scope of the Release, it was incumbent upon them to identify those debts explicitly, as they did in paragraph 2 with respect to certain accounting bills. Appellees must accept the consequences of their failure to do so.

The dissent mistakenly relies upon *ejusdem generis,* a doctrine invoked where specific words are followed by more general terms in the same sentence or provision, which presumes that parties intended to include within the general phrase only items like those mentioned in the specific listing. This maxim is inapplicable here, because the general and specific language appear in separate paragraphs of the Release. Moreover, the dissent cites no Maryland case where a court employed *ejusdem generis* to modify or restrict the unambiguous terms of a contract. *Cf. LeRoy v. Kirk,* 262 Md. 276, 277 A.2d 611 (1971) (applying rule peculiar to construction of wills that term "personal property" will be given its popular meaning—i.e., tangible goods, rather than its legal meaning—i.e., all property except real estate).

In short, Release paragraphs 1, 4, 6, and 12 are not mutually exclusive. Read *in pari materia,* these provisions reveal unmistakably that the parties released and discharged all claims and debts—including the Dupont promissory notes and deeds of trust. Under settled principles of contract interpretation, this court must hold the parties to the plain meaning of the terms of the agreement and must ignore as irrelevant any extrinsic evidence that might show that the language did not properly reflect their intent. Accordingly, we find that the trial court erred in ruling that the Release was ambiguous and in using parol evidence to alter the clear meaning of its words. *See, e.g., Hershon v. Gibraltar Bldg. & Loan Ass'n, Inc.,* D.C.Civ.Action Nos. 84–3591 and 85–0020, transcript of bench opinion at 17 (D.D.C. Mar. 25, 1986) (after examining extrinsic evidence, district court "could not find any *intent* that the deeds of trust ... would be released ... *despite the terms of the agreement which are very strong*") (emphasis added).

We acknowledge that the application of the objective test and its corollary, the parol evidence rule, can lead to harsh consequences, and this may well be such a case. Nonetheless, it is fundamentally important that parties be able to rely on the explicit language of written contracts. The public interest in certainty and finality is too critical to allow every agreement to be subjected to collateral attack.

This policy applies with special force to releases, which are designed to resolve disputes out of court—not to spawn litigation. Parties will enter settlement agreements only if they are assured that the language contained in such releases will be treated as definitive and final. As the Maryland Court of Appeals explained, in holding the parties to the terms of their release agreement discharging "any and all claims, demands, actions ... or suits of whatever kind or nature,"

... in this era of burgeoning litigation, compromise and settlement of disputes outside of court is to be encouraged and, thus, a release evidencing accord and satisfaction is a jural act of exalted significance which without binding durability would render the compromise of disputes superfluous, and accordingly unlikely.

*Bernstein v. Kapneck,* 290 Md. 452, 459, 430 A.2d 602, 606 (1981).

In sum, we simply enforce the bargain that the parties themselves freely made, as unambiguously expressed in their agreement. Our decision is thus consistent with

basic contract law principles and serves their underlying policy goals.

## III. CONCLUSION

The Release executed between appellants and appellees contained clear language providing for the release and discharge of all claims. The district court erred in ruling that the agreement was ambiguous and in using parol evidence to contradict its plain meaning. Accordingly, we dismiss Gibraltar's cross-appeal, reverse the district court's judgment, and remand with instructions to enter judgment in favor of plaintiffs.

*SO ORDERED.*

WILLIAMS, Circuit Judge, dissenting:

Simon Hershon and Lawrence B. Goldstein engaged over the years in a series of complex business transactions. Their relations deteriorated, to put it mildly, so that by the summer of 1984 there were five lawsuits pending between them. In the hopes of resolving those conflicts, they and various related parties entered into a Mutual Release and Discharge Agreement on August 24, 1984. Apparently the Release successfully disposed of the conflicts to which it was addressed.

At the time of the Release, however, Hershon and several relations and associates (his mother, his ex-wife, and a business associate (Anton Vierling) and his wife) were the obligors on promissory notes payable to Gibraltar Building & Loan Association (a firm controlled by Goldstein) and secured by deeds of trust on several condominiums in the Admiral Dupont building in Washington. The loans amounted to about $300,000. The trial court found (and it appears undisputed) that during the negotiations looking toward the Release no one mentioned the condominium loans. Joint Appendix ("J.A.") at 79. The loans were never in dispute between the parties and are in no way related to the lawsuits disposed of by the Release. No documents relating to the loans were delivered or signed under Paragraph 12 of the Release, which limited the parties' agreement to the Release, "together with the other documents and transactions executed simultaneously herewith." Significantly, a promissory note concerning a disputed indebtedness *was* delivered and cancelled under Paragraph 12. See *id.* at 79 (trial court finding); *id.* at 143 (list of items for delivery under Paragraph 12, captioned, "Hershon, et al.—Goldstein, et al./Settlement of Disputes"); Goldstein deposition at 52. The borrowers dutifully made the monthly payments due on these loans for September 1, 1984. J.A. at 77, 79. As to the Vierling loan, Anton Vierling on August 29, 1984 wrote to ask Gibraltar "to re-issue the loan under your currently more favorable terms." *Id.* at 77, 79 (trial court finding); *id.* at 153 (letter). Not until mid-September did the borrowers reveal their discovery that the Release could be construed to cancel the loans.

Thus it is not seriously in dispute that the parties did not intend the Release to cover the condominium loans. Counsel for the borrowers at oral argument made no claim to the contrary. Instead, relying on sweeping generalities in the Release, the borrowers invoked the parol evidence rule. Although that rule is normally viewed as an aid for *effecting* the parties' intent, the court here allows it to be transformed into a device for thwarting that intent. I dissent.

Even without regard to extrinsic evidence, the Release itself is ambiguous. Its specific focus is plainly on the five pending lawsuits enumerated in Paragraph 4, which introduces them as follows:

> 4. It is expressly agreed that this Mutual Release and Discharge is, and shall be, a full and complete termination, settlement and satisfaction of any and all Claims alleged and matters in dispute in [the enumerated cases]....

Moreover, the absence of the condominium notes from among the instruments delivered under Paragraph 12 and the delivery and cancellation of a note that was in dispute between the parties strongly suggest the absence of any intent to cancel the condominium loans.

In addition, of course, the Release contains some very broad terms, obviously

cobbled together from form books. Paragraph 1(d) most patently illustrates the cut-and-paste approach by gratuitously repeating the term "debts." See text quoted in Maj.Op. at 849. The phrases used are very expansive, e.g., "of any kind or nature whatsoever, known or unknown, tangible or intangible, fixed or contingent." See *id.* (quoting Paragraph 1(d)). But none of the broad clauses of Paragraphs 1(d) and 6, see *id.* at 849, 850, expressly encompasses what is at stake here: debts that were both (1) absolutely free from dispute and (2) totally unrelated to the lawsuits being settled.

Where broad general terms are used in juxtaposition with specific ones, the lawyer's mind turns naturally to the maxim *ejusdem generis.* This expresses the idea that where a legal document employs generalities but offers specific examples, the generalities may well refer only to cases "of the same class or general nature" as the specifics. See *Maryland v. One Hundred & Fifty–Eight Gaming Devices,* 304 Md. 404, 499 A.2d 940, 953 n. 12 (1985) (use of the maxim in statutory interpretation); see also *Neuman v. Travelers Indemnity Co.,* 271 Md. 636, 319 A.2d 522, 527 (1974) (use in the interpretation of a contract). Here that principle would call for excluding from the Release obligations that were neither in dispute nor related to the five lawsuits.

The Maryland courts have used the *ejusdem generis* maxim to limit words that appeared facially unambiguous. In *LeRoy v. Kirk,* 262 Md. 276, 277 A.2d 611 (1971), a testator left "all of my personal property, including my automobile, boat and the contents of my house and outbuilding," to the appellant. *Id.* at 612. Just as with the Release, the court could have read the phrase "all of my personal property" in its standard sense, i.e., encompassing intangible as well as tangible personal property. The court rejected that approach as "too simplistic" and found the phrase limited to tangible personal property. *Id.* at 614.

*Ejusdem generis* is typically used when the general words appear in the same sentence or provision as the more specific

words. The Release poses a slightly different problem, in that Paragraphs 4 and 12 (taken together with the documents executed under the latter) focus on the hotly disputed lawsuits, while the sweeping language appears in other Paragraphs (1(d) and 6). But this fact scarcely renders irrelevant the insight into mental operations on which *ejusdem generis* rests: that when persons concentrate their attention on solving a specific problem, their use of broader terms may reflect that focus. The solid problem bends the generality as a prism bends light.

To some extent that insight as to distorting focus may be phrased in terms of carelessness. Here, a surmise of carelessness is strengthened by the sloppy redundancy in Paragraph 1(d) and by the fact that the parties rushed the drafting of the instrument to enable Simon Hershon to complete it before he left for a trip to Europe at the end of August 1984. (A costly courtesy, it proves!) Indeed, the plaintiff parties here, with the exception of Simon Hershon, signed the signature page without seeing the full document. J.A. at 75–76.

I invoke *ejusdem generis* in this context, of course, not to resolve the interpretive question posed by the document, but merely to establish its existence. But see Maj.Op. at 852, 853 (denying any ambiguity).

Thus I find an ambiguity in the instrument itself (with attachments under Paragraph 12), as did the trial court. In his opinion delivered from the bench, Judge Hogan concluded:

> In reviewing the Release document, ... the Court, based upon the factual findings it has made, has considered ... the term 'Claims' as to whether or not it relates only to those types of *Claims under consideration in Paragraph Four, specific enumerated lawsuits,* and *the Claims set forth otherwise in the attached documentation at the time of settlement* between the parties, or whether it refers to reading Paragraph (1)(D) as to Claims meaning any debt, any contract, any obligation, any responsibility, any interest of any kind, known

or unknown, generally could be read to cover the deeds of trust and promissory notes in this case as ambiguous on its face.

J.A. at 85–86 (emphasis added). The particular finding of fact on which the judge rested his conclusion that the Release was facially ambiguous was that "Mr. Hershon did not raise any question at the settlement conference that these deeds of trust were to be released and the promissory notes cancelled, although he asked that the promissory notes in a related corporation ... be supplied to him at that settlement conference." *Id.* at 79.[1]

Under every formulation of the parol evidence rule, a finding of ambiguity in the contract justifies admission of parol evidence to *resolve* the ambiguity. Because of possible doubt as to the existence of an ambiguity in the agreement, however, I turn to Maryland law to inquire whether extrinsic evidence is admissible to *reveal* an ambiguity.

As the court here correctly notes, Maryland subscribes to the standard precept that the parol evidence rule requires that evidence which "varies, alters, or contradicts the clear meaning of the writing" be excluded from the factfinder. Maj.Op. at 852 (quoting *Admiral Builders Sav. & Loan Ass'n v. South River Landing*, 66 Md.App. 124, 502 A.2d 1096, 1099 (Ct.Spec. App.1986)). But the court does not dispute the offsetting precept of Maryland law—that extrinsic evidence is relevant to identifying the existence of an ambiguity within the language of the contract. See Maj.Op. at 851 (citing the famous Peerless case, *Raffles v. Wichelhaus*, 2 Hurl. & C. 906, 159 Eng.Rep. 375 (Ex.1864)); see also *Admiral Builders Sav. & Loan Ass'n*, 502 A.2d at 1099 (correct to use extrinsic evidence in making the "primary" finding of ambiguity); 4 *Williston on Contracts* § 600A, at 299 (3d ed. 1961) ("In interpret-

ing contracts or clauses set forth in 'clear and unambiguous' language, the courts do not confine themselves to a mere inspection of the document. Before committing themselves, the courts carefully examine the surrounding circumstances, prior negotiations, and all other relevant incidents bearing on the intent of the parties.") (citations omitted).

Judicial statements that parol evidence may not be used to *contradict* the plain or clear language of a contract obviously are in tension with others to the effect that extrinsic evidence is admissible to ascertain *whether* the language is clear or plain. Corbin and Williston explain the contradiction, suggesting (as I read them) that the no-contradiction rule is invoked by courts to support the conclusion (once they have reached it) that the extrinsic evidence failed to raise a sufficient question about the apparent meaning of the agreement. As Corbin says, "No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation it is determined what the writing means." 3 *Corbin on Contracts* § 579 (1960). And Williston writes,

> It is a fair inference that when, *after* exposing the writing to the myriad facets of interpretation, the court applies the principle that a 'clear and unambiguous' writing may not be varied or amplified, it has come to the conclusion that whatever the extrinsic evidence might show, it could not change the intent of the parties as expressed in the writing at the time the agreement was made.

4 *Williston on Contracts* § 600A, at 301–03 (emphasis added).

The American Law Institute is perhaps blunter, saying, in effect, that extrinsic evidence may in proper cases override superficially explicit language:

---

1. The majority states that counsel for appellees conceded during oral argument that the district court "failed to identify any facts or external evidence to support its conclusion that the Release was *facially* ambiguous." Maj.Op. at 852. Such a concession of course could not alter the content of the district court's opinion. In any event, counsel's remark, "He does not articulate

them, Judge," cannot in full context be taken as such a concession. Indeed, a few minutes earlier, appellees' counsel had argued that "Judge Hogan found that there is no document or documents signed at the settlement table that were referenced in Paragraph 12 of the Release and referenced in the agenda." He attempted to discuss other findings but was interrupted.

The purposes of the parties to a contract are not always identical; ... the parties often have divergent or even conflicting interests. But up to a point they commonly join in a common purpose of attaining a specific factual or legal result which each regards as necessary to the attainment of his ultimate purposes.... Determination that the parties have a principal purpose in common requires interpretation, but if such a purpose is disclosed further interpretation is guided by it. *Even language which is otherwise explicit may be read with a modification needed to make it consistent with such a purpose.*

2 Restatement (Second) of Contracts § 202, comment c (1981) (emphasis added); see also 2 *id.* § 212, comment b (reliance on surrounding circumstances "not limited to cases where it is determined that the language used is ambiguous"); *White v. Roughton,* 689 F.2d 118 (7th Cir.1982) (quoting and applying Restatement), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983); *Alliance to End Repression v. Chicago,* 742 F.2d 1007 (7th Cir.1984) (en banc) (same).

Maryland cases in fact indicate a readiness to vary the explicit terms of an agreement. See *Rinaudo v. Bloom,* 209 Md. 1, 120 A.2d 184 (1956) (in rescission action, buyer allowed to prove payment of $25,000 on purchase price of $100,000, as against contract recitation of only $10,000 paid on $85,000 price); *Dinsmore v. Maag–Wahmann Co. of Baltimore,* 122 Md. 177, 89 A. 399 (1914). The Maryland Court of Appeals has characterized these cases as ones "allowing extrinsic proof of the original price and of credits allowed against it," see *Rinaudo,* 120 A.2d at 192, and referred to them as creating an "exception" to the parol evidence rule, *id.* at 193. As the Maryland cases do not explain why such evidence is conceptually different from any other parol evidence, the explanation may be simply that so far the only cases in which the extrinsic evidence *actually established* the ambiguity have involved that fact pattern.

It is worth noting that some of the facts characterized here as extrinsic evidence oc-curred after the Release was signed—the borrowers' payment of September 1 installments and the Vierlings' request for re-financing. Plainly these are not covered by the parol evidence rule as normally conceived, i.e., relating to antecedent agreements or negotiations. Indeed, Corbin views the rule as manifesting little more than the truth that prior agreements cannot modify later ones:

No contract whether written or oral can be varied, contradicted, or discharged by an antecedent agreement. Today may control the effect of what happened yesterday; but what happened yesterday cannot change the effect of what happens today. This, it is believed, is the substance of what has been unfortunately called the "parol evidence rule."

3 *Corbin on Contracts* § 574, at 371–72; see also E. Allan Farnsworth, *Contracts* § 7.2, at 451 (1982) (same).

Nonetheless, courts treat post-contract conduct quite similarly to pre-contract acts, saying that the parties' "practical construction" of an agreement is inadmissible to vary its unambiguous terms. See, e.g., *Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 200 A.2d 166, 170 (1964) (plaintiffs concede that "the practical construction of an agreement as evidenced by the acts and conduct of the parties is only available in the event of an ambiguity"); compare *Mateer v. Reliance Ins. Co.,* 247 Md. 643, 233 A.2d 797 (1967) (insurer's prior payment of claim admissible to prove that policy insuring against loss by "flood" encompassed damage to items on shelves injured by drops of water en route from burst water main to floor). We may infer, again, that a court will disregard the extrinsic evidence only when it is convinced that the conduct is in fact insufficient to disturb the construction at which it would otherwise have arrived. (Of course the later conduct may in some cases amount to a modification of the agreement, see *Food Fair,* 200 A.2d at 171, which could not be true of antecedent agreements or communications.)

Thus, still assuming that the language of the Release and the documents executed under Paragraph 12 did not alone establish

an ambiguity, the critical question would be simply whether those facts, together with the events before and after execution of the Release, undermine the borrowers' claim that it unambiguously released them from their condominium loans. The majority concludes that the district court "failed to identify any facts or external evidence to support its conclusion that the Release was facially ambiguous." Maj.Op. at 852. While the district court's oral opinion may have lacked precision, it seems clearly (and by my lights correctly) to have initially found ambiguity in the clash between the Release's general terms, on the one hand, and, on the other, its specific focus on the disputed lawsuits and the absence of the condominium notes from the documents delivered under Paragraph 12. See above at 4–5, quoting J.A. at 79, 85–86. It then proceeded to resolve the ambiguity, on the basis of those facts plus the testimony as to the prior negotiations' never having addressed the condominium loans, the borrowers' continued payment of monthly installments under the loans, and the Vierlings' post-Release request for refinancing of their loan. J.A. at 86–88. The evidence is ample to support a finding that the Release did not plainly, clearly, or unambiguously release the loans and relieve the borrowers of nearly $300,000 of previously uncontested indebtedness.

Under Rule 52(a) of the Federal Rules of Civil Procedure we are not to set aside such findings unless "clearly erroneous." This deference is appropriate for findings "whether based on oral or documentary evidence," *id.*, or, as the Restatement puts it, whether the interpretation "depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence," 2 Restatement (Second) of Contracts § 212(2).

The majority, understandably uneasy with the "harsh consequences" of the rule as it has applied it, invokes a higher good— the importance of enabling parties to "rely on the explicit language of written contracts" and "[t]he public interest in certainty and finality." Maj.Op. at 853–54. If the parol evidence rule were designed to achieve such a higher good, or (perhaps) if

I were persuaded that it could be recruited into its service, I might be ready to sacrifice the parties on that altar. Neither is true. Its purpose is, as Farnsworth puts it, to give "legal effect to whatever intention the parties may have had to make their writing a complete expression of their agreement." Farnsworth, *Contracts* § 7.2, at 451. Corbin too saw the rule as aimed at implementing the parties' intent. In the supplement to his treatise, he offered a number of general principles as an introduction to the study of the rule, including:

> 1. The primary and ultimate purpose of interpretation is to determine and make effective the *Intention of the Contracting Parties.*
>
> 2. No contract should ever be interpreted and enforced with a meaning that neither party gave it.
>
> . . . .
>
> 4. No party to a contract should ever be bound by an interpretation that is determined exclusively by the linguistic education and experience of the judge.
>
> . . . .
>
> 6. When a court enforces a contract in accordance with an interpretation that seems "plain and clear" to the court and excludes relevant convincing evidence that the parties intended a different interpretation, it is "making a contract for the parties", one that they did not make.

3 *Corbin on Contracts* § 572B (Supp.1971) (emphasis and capitalization in original). The rule asks judges to find intent, not to blind themselves to it.

Were it plausible that draconian decisions such as the present one would chasten lawyers, induce better drafting, eliminate ambiguity, or spare courts the need for seeking out the parties' intent, the decision would not be so unfortunate. But I see no reason to expect such beneficent results. Complex factual arrangements will continue not to yield to lawyers' phrasing; focus on immediate problems will cause parties to ignore the potential sweep of generalities; and parties with much at stake will try to persuade courts that the

surrounding circumstances justify a reading different from that to which a reader of the language might initially leap. Often they will succeed, as I believe they should have here.