# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 12, 2006          Decided January 16, 2007

No. 05-7076

STEVEN R. PERLES, P.C. AND STEVEN R. PERLES, ESQUIRE,
APPELLANTS

v.

ANNE-MARIE KAGY,
APPELLEE

Consolidated with
05-7077, et al.

Appeals from the United States District Court
for the District of Columbia
(No. 01cv00105)

*Steven M. Schneebaum* argued the cause and filed the briefs for appellants/cross-appellees Steven R. Perles, P.C. and Steven R. Perles, Esquire.

*John W. Karr* argued the cause and filed the briefs for appellant Thomas Fortune Fay.

*Mark D. Cummings* argued the cause for appellees/cross-appellants Anne-Marie Kagy. With him on the briefs was *David*

*E. Sher*.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*:  Like a contentious corporate merger or a sizable family inheritance, a large contingency fee in a successful lawsuit sometimes leads to nasty controversy over who gets what.  This case is a fine example.

From 1994 to 1999, recent law school graduate Anne-Marie Kagy worked as an attorney for solo practitioner Steven Perles. Among her other work, Kagy assisted Perles with two wrongful death actions brought by Perles's clients against the Government of Iran (the *Flatow* and *Eisenfeld* cases).  Perles's clients eventually obtained verdicts of more than $200 million in each case.  Congress used frozen Iranian assets to compensate the victims for the compensatory portions of the damages awards (more than $20 million in each case).  As a result, attorney Perles received millions of dollars in contingency fees. Perles and Kagy had no *written* contract on how Kagy would be paid for her work on these two cases, but Kagy claims they had an *oral* contract entitling her to a one-third share of Perles's fee in each case.  After a bench trial, the District Court concluded that the parties had an express oral contract entitling Kagy to one-third of Perles's ultimate fee with respect to the *Flatow* case (meaning more than $1.3 million for Kagy for her work on that case), but not with respect to the *Eisenfeld* case.  We conclude that Perles and Kagy did not enter into a contract with respect to Kagy's work on either case.

3

I

1. During the period relevant to this case, Steven Perles, an experienced attorney in private practice, owned and ran a sole-practitioner law firm in the District of Columbia. While she was in law school, Anne-Marie Kagy earned academic credit as an unpaid clerk for Perles. After she graduated in 1994, Kagy worked for Perles as a paid employee for about five years. During that time, Perles and Kagy occasionally discussed the terms of Kagy's compensation. Notwithstanding numerous conversations, however, they never put those terms in writing.

Before Kagy's work on the two matters at issue here, her compensation varied from case to case. If the client paid Perles by retainer or based on attorney hours worked, Perles would pay Kagy an hourly rate of up to $50 an hour. Kagy's work on such matters included, among other things, legal research, drafting pleadings, and preparing exhibits. Kagy also assisted Perles with about 20 administrative claims matters before the U.S. Foreign Claims Settlement Commission. In those administrative proceedings, Perles represented Jewish Americans enslaved by the Nazis during World War II. Pursuant to statute, Perles's clients sought to recover certain compensation from a fund administered by the Commission. The sums awarded in those proceedings were modest; under federal law, moreover, Perles's maximum fee was only 10 percent of the award. *See* 22 U.S.C. § 1623(f). Perles in turn paid Kagy one-third of his fee in nine successful claims, which earned Kagy about $20,000 from those matters over a period of three years (or just over $2,000 per successful case).

2. Kagy also worked for Perles on a contingency fee case, *Flatow v. Islamic Republic of Iran*. Beginning in 1996, Perles represented Stephen Flatow in that matter under a typical arrangement in which Perles would receive one-third of any

eventual recovery by Flatow. (Perles eventually was joined by co-counsel Thomas Fay.) Flatow claimed that terrorists with ties to the Iranian government murdered his daughter. In a tort action filed under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7), Flatow sought to recover compensatory and punitive damages from the Government of Iran.

Kagy worked on the *Flatow* case for several years. Among other things, she helped prepare the complaint; oversaw service of process on Iran; wrote a comprehensive memo in which she anticipated and analyzed possible defenses; and helped draft proposed findings of fact and conclusions of law.

As with other cases on which Kagy worked, she and Perles never put the terms of her compensation for her work on *Flatow* in writing. In March 1997, Kagy drafted a written agreement that would have entitled her to one-third of Perles's fee in the *Flatow* case. As Kagy admits, Perles told her the draft was "all wrong" and refused to sign it. District Court Op. at 5 n.6; Kagy's Br. at 9; J.A. 633-40 (trial transcript). After Perles refused to sign Kagy's proposal in March 1997, Kagy "repeatedly" but unsuccessfully asked Perles to reduce their alleged one-third fee arrangement to writing. District Court Op. at 5 n.6; *see also* Kagy's Br. at 13; J.A. 712, 723. According to Kagy, she and Perles discussed the issue while speaking on the telephone in May 1997. During that conversation, Kagy asked to be paid more than one-third of Perles's fee in the Holocaust administrative matters. Kagy asserts that Perles responded that a one-third share of his fee would "always be appropriate" in his contingency fee cases, including *Flatow*. District Court Op. at 9. Perles claims that he said no such thing with respect to the *Flatow* case; rather, he contends that he planned to pay Kagy an elevated hourly rate (meaning more than $50 per hour) for her work on *Flatow* if they won the case and received a fee. Kagy testified that she did not try to prepare a writing to reflect the

May 1997 telephone conversation because she was concerned that Perles would not sign it, just as he had refused to sign the draft she composed in March 1997, and because she "did not want to go through that experience again." J.A. 713-14, 723. Kagy nonetheless asserted that "on numerous occasions" after the May 1997 exchange, she tried to persuade Perles to "sit down and work it out," but that Perles "always refused to do so." J.A. 723.

Two subsequent developments in the *Flatow* litigation brought Perles a huge pay-out. First, in March 1998, the trial court entered a default judgment against Iran and its co-defendants because the defendants did not enter an appearance to contest the suit. The court awarded Flatow almost $250 million, including $23 million in compensatory damages and $225 million in punitive damages. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998). Second, in October 2000, Congress enacted legislation to use frozen Iranian assets to pay the compensatory damages portion of the *Flatow* judgment. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002, 114 Stat. 1464, 1541-43. In January 2001, the U.S. Treasury paid Flatow $23 million, of which Perles's firm earned about $7 million in attorney's fees (which Perles in turn split evenly with his co-counsel Fay in the case).

3. In 1998, Perles took on a new case, *Eisenfeld v. Islamic Republic of Iran*. As in *Flatow*, the plaintiffs in *Eisenfeld* sought damages from the Iranian government for terrorist attacks against their family members. Kagy assisted Perles on the *Eisenfeld* case. As with *Flatow*, Perles and Kagy did not reach a written agreement for Kagy's compensation on this case. Kagy left the firm in 1999, before the *Eisenfeld* case was tried or concluded, although she apparently continued to do some off-site work for Perles at a rate of $50 per hour. In July 2000, the

trial court found Iran liable and awarded damages in excess of $327 million, including $27 million in compensatory damages (meaning about $9 million in fees for Perles's firm to be divided with co-counsel Fay). *See Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000).

4. Upon learning that Perles would recover millions of dollars in fees for his work (as a result of the legislation freeing up frozen Iranian assets), Kagy contacted Perles's co-counsel by telephone in October 2000 to secure her share of the money. The conversations did not go well (to put it mildly). Shortly thereafter, Perles filed suit against Kagy in the District Court. Perles sought a declaratory judgment that he should pay Kagy on an hourly basis for her work on the *Flatow* and *Eisenfeld* cases. Kagy filed a counterclaim in which she asserted that she and Perles had an oral contract entitling her to one-third of Perles's fees in *Flatow* and *Eisenfeld*. Both parties agreed, as they do on appeal, that District of Columbia law governs their respective claims.

After a bench trial, the District Court found that Perles and Kagy had an express oral contract entitling Kagy to one-third of Perles's fee in *Flatow*, meaning Kagy would recover more than $1.3 million for her work on that case. In the court's judgment, the oral contract did not cover Kagy's work on *Eisenfeld* (nor did the parties have any enforceable contract on *Eisenfeld*). Instead, the court ruled that Kagy would receive only equitable compensation for her work on the *Eisenfeld* case. The court determined the amount of Kagy's recovery for her work on *Eisenfeld* by multiplying the number of hours Kagy worked on the case by an hourly rate of $283 (which was Perles's average hourly rate). Applying this formula, the District Court awarded Kagy about $47,000 for her work on *Eisenfeld*.

On appeal, Perles contends that the District Court erred in

concluding that the parties had an enforceable contract on the *Flatow* case. Perles further argues that the District Court did not apply a correct formula for assessing Kagy's equitable recovery for her work on *Eisenfeld*. For her part, Kagy seeks affirmance of the District Court's judgment in *Flatow*; and as to *Eisenfeld*, Kagy claims that the District Court erred in concluding that the parties did not have a contract entitling her to one-third of Perles's fee.

## II

We turn first to the question whether Perles and Kagy had an enforceable contract for Kagy's work on the *Flatow* case. Relying on Kagy's testimony about the parties' May 1997 telephone conversation, the District Court found that the parties entered into an oral contract entitling Kagy to one-third of Perles's fee in that case. We review de novo the legal question whether the facts as found by the District Court demonstrate the existence of an enforceable contract. *See Hershon v. Gibraltar Bldg. & Loan Ass'n*, 864 F.2d 848, 852 (D.C. Cir. 1989). We accept the factual findings underlying the District Court's contract determination unless they are clearly erroneous. *Id.*

Under District of Columbia law, a valid and enforceable contract requires both: (1) intention of the parties to be bound; and (2) agreement as to all material terms. *See Simon v. Circle Assocs.*, 753 A.2d 1006, 1012 (D.C. 2000); *see also Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995); *Georgetown Entm't Co. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985). The party asserting the existence of an oral contract has the burden of proving both requirements. *See New Econ. Capital, LLC v. New Mkts. Capital Group*, 881 A.2d 1087, 1094 (D.C. 2005).

Applying those principles to this case, we conclude for

either of two alternative reasons that Kagy failed to prove that the parties entered into an enforceable oral contract as to Kagy's work on the *Flatow* case. First, even assuming that the District Court properly credited Kagy's testimony concerning the May 1997 telephone conversation, the evidence presented by Kagy does not show that both parties intended to create an enforceable oral contract. Second, again accepting Kagy's own version of the facts, the parties did not agree on two essential elements of the contract: how long Kagy would have to work on the case and what kind of work she would have to do.

1. To create an enforceable oral contract, both parties must intend to be bound by their oral representations alone. *See New Econ. Capital*, 881 A.2d at 1094; *Jack Baker, Inc.*, 664 A.2d at 1238. An otherwise valid oral agreement does not constitute a contract if "either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist . . . until the whole has been reduced to . . . written form." RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. b (1981); *cf. Osborne v. Howard Univ. Physicians, Inc.*, 904 A.2d 335, 339 (D.C. 2006) (relying on RESTATEMENT OF CONTRACTS); *Stansel v. Am. Sec. Bank*, 547 A.2d 990, 993 (D.C. 1988) (same). The fact that parties contemplate a writing is evidence, therefore, that they do not intend to bind themselves by an oral agreement. *See Jack Baker, Inc.*, 664 A.2d at 1240; *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C. 1981). Another factor in determining intent to be bound is the parties' conduct *after* they reach an alleged oral agreement. *See Duffy v. Duffy*, 881 A.2d 630, 637 (D.C. 2005); *Edmund J. Flynn Co.*, 431 A.2d at 547; *see also Novecon, Ltd. v. Bulgarian-Am. Enter. Fund*, 967 F. Supp. 1382, 1388 (D.D.C. 1997). Under District of Columbia law, courts determining whether parties intend to be bound by oral representations consider other factors as well, including "whether the amount involved is large or small." *Jack Baker, Inc.*, 664 A.2d at 1240.

Applying the above principles to this case, we conclude that Kagy has not met her burden of proving that she and Perles intended to create an oral contract in their May 1997 telephone conversation. Three considerations support that conclusion: the fact that the parties clearly contemplated a written agreement; the conduct of the parties after their May 1997 telephone conversation; and the potentially large amount of money at issue in the alleged oral agreement.

*First*, the evidence establishes that Kagy and Perles discussed and contemplated a written agreement. In March 1997, Kagy drafted a proposed written contract providing that she would recover one-third of Perles's fee in *Flatow*. By Kagy's own admission, Perles refused to sign Kagy's proposal on the ground that it was "all wrong." District Court Op. at 5 n.6. Kagy testified that she repeatedly asked Perles to reduce their alleged one-third fee arrangement to writing after Perles refused to sign Kagy's proposal in March 1997. About a month *after* their May 1997 telephone exchange, moreover, the parties had a serious "altercation" arising out of "Kagy's frustration at not having a written fee agreement in place." *Id.* at 9-10. The evidence indisputably establishes, therefore, that the parties at various points contemplated a written contract. Under settled principles of District of Columbia contract law – principles that were not addressed by the District Court in its opinion – the fact that the parties contemplated a written agreement suggests that the parties did not intend to be bound by oral representations alone. *New Econ. Capital*, 881 A.2d at 1094; *see Jack Baker, Inc.*, 664 A.2d at 1240 (no oral contract found where "[i]t was unquestioned that a written contract was contemplated as part of the transaction"); *Edmund J. Flynn Co.*, 431 A.2d at 547 (parties did not intend to be bound by preliminary oral representations where, among other things, a "written contract embodying the completed contract was contemplated"); 1 ARTHUR LINTON

CORBIN, CORBIN ON CONTRACTS § 2.9 (Joseph M. Perillo ed., rev. ed. 1993) ("The fact that the parties contemplate the execution of a document is some evidence, not in itself conclusive, that they intend not to be bound until it is executed.").

*Second*, the parties' conduct *after* the May 1997 telephone conversation is a separate factor suggesting that the parties did not intend to create an oral contract. Perhaps most telling, the trial evidence does not reveal *any* conduct of the parties after the May 1997 conversation that supports Kagy's assertion that they created a binding contract in that conversation. In fact, Kagy testified that she did not draft a written agreement reflecting the terms of the May 1997 telephone conversation because she was concerned that Perles would not sign it. Kagy also testified that "on numerous occasions" *after* the May 1997 exchange, she tried to persuade Perles to "sit down and work it out," but Perles "always refused to do so." J.A. 723. The context of Kagy's statement makes clear that what had to be "worked out" was Kagy's compensation in *Flatow*, which suggests that no final agreement had been reached in the May 1997 telephone conversation. In short, the evidence of the parties's conduct after the May 1997 conversation does not indicate that the parties intended to be bound by the conversation. *See Duffy*, 881 A.2d at 637 (assessing intention to be bound by letter agreement by considering appellant's actions during the year and a half after the parties signed the letter); *Edmund J. Flynn Co.*, 431 A.2d at 547 ("subsequent negotiations about drafts of a written sales commission agreement reflect the parties' intention not to be bound until a formal writing was executed"); *see also Novecon*, 967 F. Supp. at 1388 (noting that "the subsequent actions taken by both parties is relevant" and "should be taken into consideration to determine whether a binding contract existed").

*Third*, the potentially large fee award in the *Flatow* case further suggests that Perles and Kagy did not intend to be bound by their oral conversation. Perles's client in *Flatow* was eventually awarded more than $200 million in damages from the Iranian Government. Perles has received several million dollars so far in fees (and could receive far more in the future if additional assets become available to cover the punitive damages awards). It strains credulity to suggest that Perles and Kagy, both of whom are attorneys, intended a single, undocumented telephone conversation to give rise to a mutually binding agreement giving a junior attorney the potential right to millions of dollars in compensation for her work. *See Jack Baker, Inc.*, 664 A.2d at 1240 ("whether the amount involved is large or small" is one factor to consider in determining whether parties entered into an enforceable oral agreement; oral representations did not create binding contract where subject of the alleged agreement "was a major project, involving a considerable amount of money"); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. c ("whether the amount involved is large or small" is factor "which may be helpful in determining whether a contract has been concluded"); 1 CORBIN ON CONTRACTS § 2.9 ("The greater the . . . importance of the transaction, the more likely it is that the informal communications are intended to be preliminary only.").

To recap, three considerations support the conclusion that the parties did not intend to be bound by the terms of their May 1997 telephone conversation: the fact that the parties clearly contemplated a written contract; the parties' post-conversation conduct evincing lack of agreement; and the large amount of money at stake. Kagy does not cite other relevant factors under District of Columbia law that support her claim; and she does not point to any concrete evidence establishing or even suggesting that both parties intended the May 1997 telephone conversation to give rise to a binding agreement. *See Jack*

*Baker, Inc.*, 664 A.2d at 1240 (dismissing breach of contract claim where party asserting oral contract failed "to put forth sufficient evidence" of intention to be bound); *Edmund J. Flynn Co.*, 431 A.2d at 547 (no oral contract where "there [was] substantial evidence in the record that a binding written sales commission contract did not exist and that only preliminary negotiations were underway."). Given this record, Kagy plainly did not meet her burden under District of Columbia law to show the existence of an oral contract. *See New Econ. Capital*, 881 A.2d at 1094; *Jack Baker, Inc.*, 664 A.2d at 1239 ("[P]arties will not be bound to a preliminary agreement unless the evidence presented clearly indicates that they intended to be bound at that point.").

2. Even if Perles and Kagy intended to be bound by the terms of their May 1997 conversation, Kagy's contract claim still would fail. Under District of Columbia law, "[t]o be final, contract negotiations must include all of the terms which the parties intended to resolve; material terms cannot be left to future settlement." *Edmund J. Flynn Co.*, 431 A.2d at 547. Agreement on the work to be done is a material term of a services contract. *See, e.g.*, *New Econ. Capital*, 881 A.2d at 1096 (parties "did not enter into an enforceable oral contract" where they "did not agree on . . . whether consulting services should be rendered" as well as fundraising services); *Stansel*, 547 A.2d at 993 (no oral contract existed because the parties failed to offer "evidence of any specific terms of the alleged agreement, such as the . . . manner of performance"). Even assuming that the District Court properly credited Kagy's testimony, Perles and Kagy did not agree on two essential elements of a services contract – how *long* Kagy would have to work on the case to obtain one-third of Perles's fee, and what *kind* of work she would have to do to earn such a potentially massive payment.

*First*, even though the parties knew that the *Flatow* litigation would likely take many years and could not yield any fee until the "quite distant future," they did not address how long Kagy would have to work on *Flatow* to recover a one-third share of Perles's fee. *See* District Court Op. at 4; *see also id.* at 3 ("years in the future"). The *Flatow* litigation had just started when the parties discussed Kagy's compensation in May 1997. Indeed, Perles initially "was reluctant to engage [Kagy] fully in the preparation and presentation of the case" because he thought Kagy might "depart for another firm at a critical stage." District Court Op. at 4. Perles affirmatively "anticipat[ed] her departure before *Flatow* had borne fruit." *Id.* Under these circumstances, the parties could not reach a complete agreement without deciding how long Kagy would have to work on the case in order to secure a third of Perles's fee. *See Edmund J. Flynn Co.*, 431 A.2d at 547 ("[N]o sales commission contract was created because there never was any agreement on the material terms of compensation *and termination*.") (emphasis added). The parties made no such decision. Indeed, at trial, Kagy admitted that she and Perles did *not* reach any meeting of the minds as to the scope of her duties in *Flatow*. She was asked: "Was there any agreed definition of what it meant to work on a case?" And she responded: "No." J.A. 705.

*Second*, the parties also failed to spell out the *kind* of work Kagy would have to perform in order to receive a third of Perles's fee. For example, was Kagy expected to perform standard junior attorney work? Or was she instead required to take on a more substantial role in the litigation? We do not know because the parties did not specify the kind of work Kagy would have to do. Again, Kagy herself testified that the parties did *not* have any "agreed definition of what it meant to work on a case." J.A. 705.

Kagy argues that the parties' prior course of dealing

supplied a reasonably certain definition of what it meant for her to "work on" a case – including both the required length of her service and the kind of work she would have to do. *Cf. Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12, 16 (D.C. 1996) (oral agreement to continue employment "involved the continuation of [the employee's] existing employment and there was no reason for [the parties] to deal with the material terms that would remain the same"). As to length of service, Kagy has asserted with notable lack of precision that she would have to work "just as she had in the Holocaust Claims." Kagy's Br. at 23. And as to the kind of work, Kagy would simply do what she did in past cases: "perform legal and factual research, draft briefs and pleadings, and provide general litigation support." Kagy's Br. at 22.

The parties' prior course of dealing in other cases does not shed light on the length and scope of Kagy's duties in *Flatow* because *Flatow* is not at all comparable to the other matters on which Kagy worked. In particular, Kagy makes far too much of the fact that she received one-third of Perles's fee in the "Holocaust Claims." Unlike *Flatow*, the Holocaust claims involved relatively straightforward and short administrative proceedings, not terrorism-related litigation against a foreign sovereign requiring years of evidence-gathering, research, and preparation. *Compare* District Court Op. at 7 (explaining that Perles's firm worked on *Flatow* for more than five years) *with id.* at 4 n.4 (noting that the firm handled about 20 Holocaust claims over a period of three years). Indeed, Kagy earned only $20,000 over a period of three years for her work on the Holocaust administrative claims matters even though Perles paid her one-third of his fee in nine successful claims. Given those substantial differences, the administrative matters are plainly insufficient to demonstrate a course of dealing that would support Kagy's claim to one-third of Perles's fee in *Flatow*. *See, e.g.*, *Ginberg v. Tauber*, 678 A.2d 543, 546-47, 552 (D.C.

1996) (attorney's "'course of dealing' with his client provided no guidance in determining a reasonable fee for the . . . litigation" where attorney sought $3.75 million for his work on the case at issue but had charged the same client between $1000 and $45,000 for prior representations).

In sum, Kagy's own version of the facts establishes that the parties did not agree on two material terms of their alleged oral agreement: how long Kagy would have to work on *Flatow* and what kind of work Kagy would have to do in that case. Because *Flatow* differed from Kagy's other work in significant ways, no prior course of dealing fills those critical gaps. As a result, and for that independent reason as well, Perles and Kagy did not enter into an enforceable contract as to *Flatow*.

### III

Kagy argues that she had an enforceable contract with Perles for one-third of Perles's fee not just for her work on *Flatow* but also for her work on *Eisenfeld*. As Kagy has claimed throughout the litigation, however, she and Perles had the "same" deal in *Eisenfeld* that they had in *Flatow*. Kagy's Br. at 10, 33; J.A. 863-64. Because the parties had no enforceable contract for Kagy's work on *Flatow*, they likewise had no enforceable contract for her work on *Eisenfeld*. We therefore affirm the District Court's judgment that Kagy does not have a contractual right to one-third of Perles's fee in the *Eisenfeld* matter.

### IV

Although the parties had no contract, Kagy is of course entitled to recover equitable compensation for her work on the *Flatow* and *Eisenfeld* cases. *See Ginberg v. Tauber*, 678 A.2d 543, 551 (D.C. 1996) (under District of Columbia law, when

"there is no agreement concerning how the amount of [an attorney's] fees is to be calculated," the trial court "determines the amount of the fee"). Many attorney's fees cases involve either (i) a dispute between a client and the client's attorney or (ii) a dispute between the opposing parties in litigation – not a dispute such as the one here between two attorneys in the same firm. Cases involving the more typical disputes nonetheless provide basic guidance that informs the fees analysis in this case. *Cf. Frazier v. Franklin Inv. Co.*, 468 A.2d 1338, 1341 n.2 (D.C. 1983) (standards governing reasonableness of fee award "apply to the assessment of attorney fees in general").

Under District of Columbia law, an attorney seeking equitable compensation must present proof of the reasonable value of the services rendered. *See Ginberg*, 678 A.2d at 551-52; *Jonathan Woodner Co. v. Laufer*, 531 A.2d 280, 287 (D.C. 1987). The ordinary measure of reasonable value is the market price of the services performed. *Sastry v. Coale*, 585 A.2d 1324, 1329 (D.C. 1991). District of Columbia courts generally compute an attorney's equitable compensation by multiplying the total number of hours reasonably expended on the case by the attorney's reasonable hourly rate. *Ginberg*, 678 A.2d at 551-52 & nn.11-12.

Applying those principles, we reach the following conclusions: We affirm the District Court's factual finding as to the number of hours Kagy worked on the *Eisenfeld* case (167.23 hours). We remand for the District Court to assess the total number of hours Kagy reasonably worked on the *Flatow* case. That leaves the question of Kagy's reasonable hourly rate. The District Court determined that Kagy should be paid an hourly rate of $283 for her work in *Eisenfeld*. The court reached that result by using *Perles*'s hourly rate (not Kagy's hourly rate) as the starting point of its analysis. Because Kagy seeks compensation for her own work, her own hourly rate ($50 per

hour) is a more appropriate starting point for valuation of her services. Perles has represented to this Court, however, that he would pay Kagy $150 per hour for her work on the two cases. Perles's Reply Br. at 18; Tr. of Oral Arg. at 12-13. We therefore accept $150 as the floor for Kagy's reasonable hourly rate and remand to the District Court to determine whether District of Columbia law authorizes an equitable adjustment that could yield a rate higher than $150 per hour. On remand, the District Court may also consider the availability under District of Columbia law of pre-judgment interest in a case of this kind, a question we do not decide here. *See* D.C. Code § 15-109; *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 550 n.6 (D.C. 1981).

Finally, we dismiss as moot the appeal by Thomas Fay (Perles's co-counsel in the *Flatow* and *Eisenfeld* cases) of the District Court's denial of Fay's motion to intervene. As Fay acknowledges, he moved to intervene in the District Court "for the limited purpose of challenging the proposed use by [Perles] . . . of money in a trust fund to which Mr. Fay claimed ownership." Fay's Br. at 2; *see also* J.A. 69 (District Court: "Fay seeks to intervene solely for the limited purpose of opposing [Perles's] motion to waive the *supersedeas* bond."); J.A. 224 (Fay's motion to intervene). Perles posted a bond using money from that trust fund "as security for the judgment pending appeal." J.A. 79. As a result of our decision today, that judgment is vacated. The bond that was the basis for Fay's attempted intervention will now be released, and Fay's appeal of the District Court's denial of his motion to intervene is therefore moot. We note that Fay's reply brief did not dispute Perles's suggestion that Fay's appeal would be moot if the judgment in favor of Kagy were vacated by this Court. *See* Perles's Reply Br. at 47 n.36.

18

V

As a matter of law, Perles and Kagy did not have an enforceable contract with respect to Kagy's work on the *Flatow* or *Eisenfeld* cases. We therefore reverse the District Court's decision that there was a contract in the *Flatow* case; we affirm the District Court's decision that there was no contract in the *Eisenfeld* case. We vacate the District Court's judgment with respect to compensation as to *Flatow* and *Eisenfeld* and remand for the District Court to calculate Kagy's appropriate equitable compensation for her work on the two cases.

*So ordered.*